# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-KA-02129-SCT

*NICKEY WILLIAMS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/08/2008 |
| TRIAL JUDGE: | HON. JAMES SETH ANDREW POUNDS |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF INDIGENT APPEALS |
| | BY:  GEORGE T. HOLMES |
| | LESLIE S. LEE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  LADONNA C. HOLLAND |
| DISTRICT ATTORNEY: | JOHN RICHARD YOUNG |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | COUNT I:  AFFIRMED; COUNT II: REVERSED AND RENDERED – 04/01/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1.     Nickey Williams was convicted of two counts of sexual battery, the first against his daughter, Jane, and the second against his daughter, Ann.[1]  At the time of the offenses, Jane was four years old and Ann was less than a year old.  Williams was sentenced to thirty years' incarceration on the first count and twenty years' incarceration on the second count with ten years suspended.  The trial court ordered that those sentences run consecutively.

_____

[1]*Jane* and *Ann* are pseudonyms.

¶2. Finding that there was insufficient evidence to support a guilty verdict for sexual battery of the younger daughter, we reverse the conviction on the second count and render judgment here in favor of the defendant, vacating the sentence on the second count. As for the conviction for sexual battery of the older daughter, we find no reversible error and affirm.

**Facts**

¶3. Nickey Williams and his wife Kimberly Williams are the biological parents of Jane, born May 22, 2001, and Ann, born April 20, 2005. The defendant initially was indicted for three counts of sexual battery and two counts of gratification of lust. Three of these charges were dismissed by means of *nolle prosequi*, and Williams was tried on two counts of sexual battery. The first count alleged that Williams inserted his finger into Jane's vagina, and the second count alleged that Williams inserted a part of his body or an object into Ann's anus. The jury convicted Williams of both counts.

¶4. In September of 2004, the Mississippi Department of Human Services (DHS) removed then-three-year-old Jane from the Williams home, based on reports and findings of neglect. The details surrounding her removal were not adduced at trial. Jane initially was placed with a cousin, but was moved six months later, on March 11, 2005, to a foster home with Kay and Michael Smith.

¶5. During the first night at the Smiths' home, Jane told Mrs. Smith that she did not like nighttime because her father would come in her room at night and spank her. According to Mrs. Smith, Jane "patted herself between her legs in the front and said that he would hurt her at night." Mrs. Smith testified that she did not report the statement to DHS because she

2

assumed sexual abuse was the reason Jane had been placed in foster care. Mrs. Smith also testified that Jane had frequent nightmares and would scream and cry out in her sleep.

¶6. Kimberly and Nickey Williams initially were allowed only supervised visits with Jane twice a month, and the defendant was present at just two of those visits from March 2005 to November 2005. The youth court eventually approved an unsupervised weekend visit, and from Friday, November 11, 2005, until Sunday afternoon, November 13, 2005, Jane stayed with her biological parents.

¶7. Mrs. Smith testified that on the Sunday evening after Jane returned to the Smiths' house, she witnessed Jane "being inappropriate" with a baby doll. When Mrs. Smith asked Jane what she was doing, Jane began crying and said that "her daddy had hurt her, he had poked her with his fingernail, he had hurt her on the bottom." When Mrs. Smith asked Jane to demonstrate with the doll, she "jabbed her finger up its bottom between its legs." Jane told her that the incident had occurred while she was in the bathtub and that her mother had witnessed it. Kimberly Williams testified at trial, but neither the State nor the defendant asked her whether she had witnessed the alleged abuse.

¶8. Mrs. Smith immediately contacted the foster care agency and Wanda Jones, the DHS social worker assigned to monitor Jane. Jones reported the incident to the Lee County Sheriff's Department and scheduled a forensic interview and a forensic medical examination for Jane. The forensic interview was not presented at trial, but Dr. William Marcy testified about the medical examination. Dr. Marcy had performed the medical examination on November 15, 2005, the Tuesday following the weekend visit. He previously had examined Jane in September 2004, based on an earlier report that she had been sexually abused. Dr.

3

Marcy had found no evidence of sexual abuse during the September 2004 examination, but he did record the child's hymenal diameter at that time. Dr. Marcy testified at trial that on November 15, 2005, the diameter had increased significantly from the time of his previous examination and that Jane's vaginal area was abnormally inflamed. He found "to a reasonable degree of medical certainty" that these conditions were consistent with vaginal penetration and sexual abuse.

¶9. On December 8, 2005, Jane attended her regularly-scheduled counseling session with Tina Ballard, a counselor for the foster care agency. When Ballard asked Jane about her weekend visit with her parents, Jane told Ballard that her father had "hurt her down there" while she was in the bathtub, and the child pointed to her vaginal area.

¶10. Jane gave testimony at trial that was consistent with the statements she had given to Mrs. Smith and Ballard. She explained that the defendant had "stuck his finger up [her] front private" while she was in the bathtub. Jane testified that Williams used his middle finger and that his fingernail had hurt her. She also demonstrated this for the jury by jamming her index finger into the vagina of a doll.

¶11. Kimberly Williams testified that during Jane's weekend visit at her and the defendant's home, the defendant was alone in the bathroom with Jane on two different occasions, Friday night and Sunday morning. Kimberly also testified that no other adults were in her home that weekend and that she had never stuck anything in Jane's vagina.

¶12. On February 13, 2006, when Williams and his wife Kimberly were arrested for sexual battery against Jane, DHS took custody of Ann, Jane's ten-month-old sister who was still

4

living with the Williamses.[2] Two days later, Dr. Marcy examined Ann for signs of sexual abuse and found that her anal area was inflamed and swollen and that the shape of her anus was irregular. He testified that Ann's anus was torn, which he found to be "very consistent with sexual abuse."

¶13. At trial, Kimberly Williams testified that since Ann's birth, she had been cared for by only three people: the defendant, herself, and Kimberly's grandmother. The grandmother, Iris Culver, testified that there was a period of time when the Williamses took Ann to another woman to be cared for while they were working; but Culver could not remember the woman's name or the specific time period. Kimberly explained that, before Ann was taken into DHS custody, Nickey Williams often was left alone with their child, Ann, while she, the mother, was at work. Both Kimberly and her grandmother denied ever inserting anything into Ann's anus.

¶14. Nickey Williams testified in his own defense, denying that he had ever abused his daughters and suggesting that Ann's anal injuries might have been caused by severe constipation. He also testified that Kimberly often would run off for days and even a week at a time, leaving him as the primary caregiver for their children. He called five character witnesses who testified that he was a truthful person. Two of these witnesses also said that Williams appeared to be a normal, loving father.

**Discussion**

¶15. Williams raises several issues on appeal, arguing that (1) there was insufficient evidence to support a guilty verdict on the second sexual battery charge involving his

---

[2]The record does not reveal the disposition of the charges against Kimberly Williams.

younger daughter, (2) the two counts should have been severed, (3) the trial court erred in excluding testimony that the defendant was a good father, (4) the trial court erred in allowing the State to introduce certain hearsay testimony, (5) the jury was tainted by misconduct, (6) the verdict in the first count involving the older daughter was against the weight of the evidence, and (7) the trial court's refusal to grant the defendant's proposed jury instruction about child testimony entitles him to a new trial.

**I. Sufficiency of the Evidence Supporting the Second Count**

¶16.    We first address whether the State presented sufficient evidence to support the jury's verdict that Williams had sexually abused his younger daughter, Ann.  On appeal, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  ***Bush v. State***, 895 So. 2d 836, 843 (Miss. 2005) (quoting ***Jackson v. Virginia***, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).   In addition,

> Should the facts and inferences considered in a challenge to the sufficiency of the evidence "point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty," the proper remedy is for the appellate court to reverse and render. ***Edwards v. State****,* 469 So. 2d 68, 70 (Miss. 1985) (citing ***May v. State****,* 460 So. 2d 778, 781 (Miss. 1984)); *see also* ***Dycus v. State****,* 875 So. 2d 140, 164 (Miss. 2004). However, if a review of the evidence reveals that it is of such quality and weight that, "having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense," the evidence will be deemed to have been sufficient. ***Edwards****,* 469 So. 2d at 70; *see also* ***Gibby v. State****,* 744 So. 2d 244, 245 (Miss. 1999).

*Id.*

¶17. The only evidence that Ann had been sexually abused was Dr. Marcy's testimony. During trial, Dr. Marcy was shown two photographs of Ann's anus, and he testified for several pages of the transcript that it was inflamed, swollen, misshapen, and torn. Part of Williams's defense was that the injury was caused by the child's having been constipated. When the State was examining him, Dr. Marcy testified as follows:

Q: So it wouldn't be consistent with a bowel movement. Would this be consistent with an object or even a finger from the outside coming in?

A: Yes, it would be more consistent with that than a bowel movement.

Q: Now, as far as your expert medical opinion looking at your report, what was your conclusion as to whether there had been – or whether [Ann's] symptoms were consistent with child sexual abuse?

A: I felt like it was very consistent with anal penetration. It – I came to the next to the highest level of *suspicion of probable* –

Q: And that's without – and I'm – you had no background, I mean no witnesses, this was just based on the medical findings?

A: Yes. I believe we were seeing her because allegations had been made about her sister and they just wanted the baby checked. So, yeah, there were no allegations at all.

Q: And you found that her condition was very consistent with child sexual abuse?

A: Yes.

. . .

7

Q: So, again, in this case, going back to this case, with [Ann's] tear on her anus was it very consistent – I'm going to put that at the top of your probable area, I'm going to ask was it very consistent with sexual abuse?

A: Yes. As I said, very consistent with anal penetration, very consistent with anal penetration.

(Emphasis added.)

¶18. Earlier, Dr. Marcy had explained that he considered "four levels of suspicion of child abuse," namely, "unlikely, possible, probable, and definite." He testified that "definite is very hard to come to," and that he would only categorize his findings of sexual abuse as "definite" "maybe five or six times out of a thousand." Dr. Marcy had found a "probable" level of suspicion from both Jane and Ann's examinations. However, Dr. Marcy testified that Jane's injuries were "definitely consistent" with someone who had been sexually abused "to a reasonable degree of medical certainty." As the above testimony demonstrates, Dr. Marcy did not recount his findings in such unequivocal terms when discussing Ann; the physician's testimony was that Ann's injuries were "very consistent with anal penetration."

¶19. "[B]efore a qualified expert's opinion may be received, it must rise above mere speculation." *Goforth v. City of Ridgeland*, 603 So. 2d 323, 329 (Miss. 1992) (citing *Fowler v. State*, 566 So. 2d 1194 (Miss. 1990)). "[O]nly opinions formed by medical experts upon the basis of credible evidence in the case and which can be stated with reasonable medical certainty have probative value." *Catchings v. State*, 684 So. 2d 591, 596 (Miss. 1991) (quoting *Magnolia Hosp. v. Moore*, 320 So. 2d 793, 799 (Miss. 1975)). Although an expert need not use the exact phrase, "reasonable degree of medical certainty," this does not

8

diminish the requirements for admissibility. *Catchings*, 684 So. 2d at 597. This physician couched his opinion in terms of *suspicion of probability*, which, standing alone, absent additional corroborating evidence, is insufficient in a criminal case.

¶20. Dr. Marcy did not express his medical opinion that Ann had been sexually abused "to a reasonable degree of medical certainty," even though he did so concerning Jane. Additionally, in Jane's case, her testimony and testimony from her foster mother and counselor provided substantial support for Dr. Marcy's findings. With Ann, there was no evidence to support the conviction for sexual battery other than Dr. Marcy's testimony. Reviewing the evidence in the light most favorable to the prosecution, we find that the evidence was insufficient to support a conviction for the sexual battery of Ann beyond a reasonable doubt. Moreover, the evidence, which was entirely circumstantial with regard to the charge concerning the younger child, Ann, fell far short of the applicable standard of proof of guilt beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. Therefore, we reverse and render the conviction of Williams on the sexual battery charge related to Ann.

**II. Severance**

¶21. Williams argues on appeal that the trial judge erred in overruling his motion to sever the two counts of the indictment. Williams was arraigned on August 2, 2006, but did not request a severance until two years later, on the first day of trial. The trial court heard arguments from both sides and denied the motion because it was untimely.

¶22. Williams argues that his motion was timely, relying on the language found in Uniform Rule of Circuit and County Court Practice 9.03:

> The court may, on motion of the state or defendant, grant a severance of offenses whenever:
>
> 1. If before trial, it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each offense; or
>
> 2. If *during trial*, upon the consent of the defendant, it is deemed necessary to achieve a fair determination of the defendant's guilt or innocence of each offense.

(Emphasis added.)

¶23. Although the rule permits a trial judge to sever offenses during trial, it is not reversible error for a trial judge to deny an untimely motion to sever, except under circumstances where the reasons supporting severance become apparent late in the process. *Walker v. State*, 729 So. 2d 197, 200 (Miss. 1998). Although *Walker* addresses motions to sever the trials of codefendants, and not motions to sever multicount indictments, its logic nevertheless is applicable to the instant case. In *Walker*, the Court held that it was not error to deny a defendant's pretrial motion to sever his case from that of his codefendant when the motion was not filed until the morning of trial. *Id.* However, it was error for the trial judge not to reconsider the motion when it became apparent from the trial proceedings that one codefendant would be seriously prejudiced by the other's defense. *Id.* at 200-02.

¶24. In the present case, nothing in the record suggests new developments or revelations during the two-year period between the date of arraignment and the morning of trial that

10

would have given the defendant additional cause for severance. Thus, it was not error for the trial judge to deny Williams's motion to sever the two offenses for trial.

### III. Exclusion of Defense Evidence

¶25.    Williams argues that the trial court erred in excluding testimony regarding his relationship with his daughters. This Court reviews a trial court's decision to admit or exclude evidence for an abuse of discretion. *Ford v. State*, 975 So. 2d 859, 865 (Miss. 2008) (citing *Peterson v. State,* 671 So. 2d 647, 655 (Miss. 1996)). We will not reverse unless the trial court applied an improper legal standard resulting in prejudice to the accused. *Id.* (citing *Peterson,* 671 So. 2d at 656).

¶26.    Williams called five individuals as character witnesses. The first two testified that he had a reputation as a truthful person and that he appeared to be a good father. When the third witness was asked about Williams's relationship with his daughters, the State objected. The trial court refused to allow the remaining witnesses to testify that Williams was a good father, because the testimony was not provided to the State in pretrial discovery. The trial court also reasoned that the testimony was irrelevant, because none of the witnesses had observed the defendant with his children in the six months prior to the night of the incident involving Jane.

¶27.    On appeal, Williams argues that the trial judge should have followed the procedures under Rule 9.04(I) of the Uniform Rules of Circuit and County Court Practice and granted a brief continuance to allow the State an opportunity to interview the witnesses. However, Williams does not address the trial court's second reason for excluding the evidence, that is, that the testimony was irrelevant because none of the witnesses could establish that they had

11

observed the defendant with his daughters at any time close to the alleged abuse. We do not find that the trial judge abused his discretion in excluding the evidence as irrelevant.

**IV. Hearsay**

¶28. Williams argues that the trial court erred in allowing Smith and Ballard to testify about the statements Jane had made to them about her abuse. He also argues that Dr. Marcy should not have been allowed to testify about the contents of the forensic interview. As noted above, the admission or exclusion of evidence is reviewed under an abuse-of-discretion standard, and we will not reverse unless an erroneous legal standard was applied that resulted in prejudice to the accused. *Ford*, 975 So. 2d at 865.

*A. Tender-Years Exception*

¶29. Before trial, the court held a hearing and determined that Smith and Ballard could testify about the statements Jane had made to them under the tender-years exception to the hearsay rule found in Mississippi Rule of Evidence 803(25).[3] Under this rule,

> A statement made by a child of tender years describing any act of sexual contact performed with or on the child by another is admissible in evidence if: (a) the court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide substantial indicia of reliability; and (b) the child either (1) testifies at the proceedings; or (2) is unavailable as a witness: provided, that when the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.

---

[3]The trial judge did not allow a third witness to testify, ruling that the statements made to this witness by Jane were too vague to be indicative of sexual abuse.

M.R.E. 803(25). The comment to the rule contains a nonexhaustive list of twelve factors that the trial judge should consider when determining whether there are sufficient indicia of reliability:

> (1) whether there is an apparent motive on declarant's part to lie; (2) the general character of the declarant; (3) whether more than one person heard the statements; (4) whether the statements were made spontaneously; (5) the timing of the declarations; (6) the relationship between the declarant and the witness; (7) the possibility of the declarant's faulty recollection is remote; (8) certainty that the statements were made; (9) the credibility of the person testifying about the statements; (10) the age or maturity of the declarant; (11) whether suggestive techniques were used in eliciting the statement; and (12) whether the declarant's age, knowledge, and experience make it unlikely that the declarant fabricated.

M.R.E. Rule 803 (citing *Smith v. State*, 925 So. 2d 825, 837 (Miss. 2006); *Hennington v. State*, 702 So. 2d 403, 415 (Miss. 1997)). "[T]he unifying principle is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made." *Bell v. State*, 797 So. 2d 945, 948 (Miss. 2001) (quoting *Idaho v. Wright*, 497 U.S. 805, 822, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990)).

¶30. The trial judge made an on-the-record determination that each factor favored admissibility of the statements, noting that: Jane had no motive to lie, the witnesses testified that Jane was truthful, more than one person had heard the statements, the statements were spontaneous and were made shortly after the incident, Jane had made the statements with certainty, there was no evidence that suggestive techniques were used, and, although Jane was very young, it would be difficult for her to fabricate such a story.

13

¶31. Williams argues, as he did at trial, that the statements could not be considered reliable because Jane could not provide details about the incident when she testified at the hearing. Throughout her testimony, Jane repeatedly answered questions with "I don't know" or "I don't remember." Williams characterizes these statements as a recantation. The State counters that Jane was reluctant to testify at the hearing because she was face-to-face with her abuser. In rejecting Williams's argument that Jane's testimony was unreliable, the trial court acknowledged that Jane's actions on the stand appeared to be related to fear, noting that as her testimony progressed, Jane "sank lower and lower in her chair."

¶32. Williams also points to testimony that Jane was developmentally delayed and was often aggressive and defiant with adults. The State argues that, although she had a history of behavioral problems, there was testimony that she was generally well-mannered and communicated maturely for her age.

¶33. Reviewing the record, we cannot say that the trial court abused its discretion in allowing Smith and Ballard to testify about the statements Jane had made to them. The trial judge heard testimony from both witnesses, and the child herself, and determined that the statements were reliable, based on the factors listed in the comment to Mississippi Rule of Evidence 803(25). The defendant's argument on this point is not persuasive.

*B. Forensic Interview*

¶*34.* Williams also argues that Dr. Marcy should not have been allowed to testify about the statements Jane gave during her forensic interview, as these constitute double hearsay. However, Dr. Marcy never testified about the specific statements and simply acknowledged

14

that a forensic interview had been performed.  Accordingly, we find this issue to be without merit.

**V. Juror Misconduct**

¶35.    Williams argues that the jury was tainted because juror Melvyn Blackmon did not respond in voir dire examination to questions about his knowing one of the State's witnesses, Wanda Jones.  The trial court held a post-trial hearing on the matter, receiving testimony from Jones and Juror Blackmon, and determined that Blackmon had not been dishonest during voir dire examination and that she was not influenced by her acquaintance with Jones.

¶36.    A trial judge's decision that the jury was fair and impartial will not be disturbed on appeal unless it appears clearly that the decision is wrong.  *Fleming v. State*,  687 So. 2d 146, 148 (Miss. 1997) (citing *Odom v. State*, 355 So. 2d 1381, 1383 (Miss. 1978); *Chase v. State*, 645 So. 2d 829, 847 (Miss. 1994); *Bush v. State*, 585 So. 2d 1262, 1265 (Miss. 1991)).  A juror's failure to respond to a question in voir dire does not warrant a new trial unless the trial court determines that the question propounded to the juror was (1) "relevant to the voir dire examination," (2) "unambiguous," and (3) such that "the juror had substantial knowledge of the information sought to be elicited." *Odom*, 355 So. 2d at 1383.  If all three questions are answered in the affirmative, the court then determines "if prejudice to the defendant in selecting the jury reasonably could be inferred from the juror's failure to respond." *Id.*

¶37.    During voir dire of the prospective jurors, the trial court read the list of potential witnesses and then asked, "any of you consider yourself close, personal friends with any of

15

the witnesses I just named?" Later, Willliams's attorney asked, "anyone have any close family members with the Department of Human Services that works with these kinds of situations?" Blackmon did not respond to either question because, according to her post-trial testimony, she did not recognize the name Wanda Jones. Both Blackmon and Jones testified that they did not know each other personally, but that they had met briefly, years earlier, when Blackmon had come to Jones's workplace selling Avon products. Blackmon testified that she recognized Jones at trial and asked her whether she was "Brenda's friend." Jones nodded, but that was the extent of their interaction. At the sentencing hearing, the defendant noticed Jones and Blackmon sitting near each other; but both Jones and Blackmon testified that they were simply sitting with a group, and the two did not have a one-on-one conversation. Blackmon emphasized that her acquaintance with Jones had no bearing on her decision-making process.

¶38.    Applying the *Odom* factors, we agree with the trial judge that Blackmon was justified in not responding to the questions asked during voir dire. The venire members were asked whether they were "close, personal friends" of the witnesses or "close family members" of DHS employees. These questions were unambiguous and relevant. However, given that Jones was simply an acquaintance and that Blackmon did not recognize her name, Blackmon did not have "substantial knowledge of the information sought to be elicited." *Odom*, 355 So. 2d at 1383. The trial judge did not err in refusing to grant a new trial based on this issue.

**VI. Jury Instruction Regarding Child Testimony**

16

¶39. At trial, Williams requested that the jury be instructed to "view the testimony of [Jane] in light of [her] age and understanding" and to "give it such weight and credit as you deem it is entitled." The trial court refused the instruction, and Williams argues on appeal that the refusal entitles him to a new trial.

¶40. Although this Court has held that a trial court *may* instruct the jury "to view the testimony in the light of the child's age and understanding," we also have held that the trial court's granting of such an instruction is not mandatory, and its refusal to do so is not grounds for reversal. *Robinson v. State*, 662 So. 2d 1100, 1106 (Miss. 1995). *See Bandy v. State,* 495 So. 2d 486, 493 (Miss. 1986) ( "If the jury is to be instructed at all with respect to the testimony of a child, it should be told to view the testimony in the light of the child's age and understanding, not his veracity."). We also are mindful of the general rule that "the trial judge should not give undue prominence to particular portions of the evidence in the instructions." *Sanders v. State*, 586 So. 2d 792, 796 (Miss. 1991). We find that the trial court did not err by refusing the proposed instruction.

**VII. Weight of the Evidence**

¶41. Williams's final argument is that his conviction of sexual battery of Jane is against the overwhelming weight of the evidence. When reviewing such a claim, the evidence is weighed in the light most favorable to the verdict. *Bush v. State*, 895 So. 2d 836, 844 (Miss. 2005) (citing *Herring v. State,* 691 So. 2d 948, 957 (Miss. 1997)). This Court will not order a new trial unless it finds that "the verdict is so contrary to the overwhelming weight of the

17

evidence that to allow it to stand would sanction unconscionable injustice." ***Id.*** (citing ***Herring***, 691 So. 2d at 957).

¶42. Williams briefly argues that Jane was "unstable, she recanted, she was aggressive, and did not follow rules." In addition, he contends, "not knowing whether she was tainted in the forensic interview makes all of the evidence which might arguably support the verdict unreliable and tainted." We find these arguments unpersuasive. Although Jane claimed she did not know about the abuse or could not remember it at the pretrial hearing, she testified at trial about the incident without any apparent difficulty and was cross-examined by the defendant. Her foster mother and counselor also testified that Jane had told them about the abuse shortly after it happened. Finally, Dr. Marcy testified that, in his expert medical opinion, Jane had been sexually abused "to a reasonable degree of medical certainty." We find that the trial court did not err in refusing to grant a new trial.

## Conclusion

¶43. Given that the State failed to present sufficient evidence to support the jury's verdict that Williams had sexually abused his daughter, Ann, that conviction is reversed and rendered. However, the conviction related to the alleged sexual abuse of Jane (Count I) is not against the overwhelming weight of the evidence, and no error related to that charge was committed at trial. Accordingly, the conviction of Williams for the sexual abuse of Jane and the sentence of thirty years in the custody of the Mississippi Department of Corrections are affirmed.

18

**¶44. COUNT I: CONVICTION OF SEXUAL BATTERY AND SENTENCE OF THIRTY (30) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: REVERSED AND RENDERED.**

**WALLER, C.J., CARLSON, P.J., DICKINSON AND LAMAR, JJ., CONCUR. GRAVES, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, CHANDLER AND PIERCE, JJ.**

**GRAVES, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶45. I agree with the majority's findings regarding all issues except the first issue: whether the State presented sufficient evidence to support the jury's verdict that Williams had sexually battered his younger daughter, Ann. The record reveals that there was sufficient evidence to support such a finding. In addition to the medical evidence consistent with sexual abuse brought forth through Dr. Marcy's testimony, the jury had the opportunity to observe the testimony of the three individuals, including Williams, who had cared for Ann before she was placed in foster care. Based on the substance of the expert and lay witness testimony, as well as on observation of the witnesses' demeanors, it was reasonable for the jury to conclude that Williams had sexually battered Ann.

¶46. An inquiry into whether evidence is sufficient to sustain a conviction "does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." *Johnson v. State*, 950 So. 2d 178, 182 (Miss. 2007). Rather, as the majority notes, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id. See also Moore v. State*, 966 So. 2d 756, 760 (Miss. 2008). This Court must accept as true all of the evidence that is

19

favorable to the State, including all reasonable inferences that may be drawn therefrom. *Moore*, 996 So. 2d at 760.

¶47. The jury determines the weight and credibility to give witness testimony and other evidence. *Massey v. State*, 992 So. 2d 1161, 1163 (Miss. 2008). This Court may not "pass upon the credibility of witnesses and, where the evidence justifies a verdict, it must be accepted as having been found worthy of belief." *Id.* (quoting *Davis v. State*, 568 So. 2d 277, 281 (Miss. 1990)).

¶48. A rational trier of fact could have found that the essential elements of the crime of sexual battery of Ann were established beyond a reasonable doubt. The jury instructions explained the elements of the crime:

> The defendant, NICKEY WILLIAMS has been charged in Count II of the indictment with the felony crime of Sexual Battery of [Ann]. If you find from the evidence in this case beyond a reasonable doubt that:
>
>> (1) [Ann], at the time of the offense was a child under the age of fourteen (14) years, having a date of birth of April 20, 2005, and
>>
>> (2) the defendant NICKEY WILLIAMS, at the time of the offense was twenty-four (24) or more months older than [Ann], having a date of birth of October 7, 1973, and
>>
>> (3) between the dates of April 20, 2005 and February 14, 2006, the defendant, NICKEY WILLIAMS, did willfully, unlawfully and feloniously engage in sexual penetration with [Ann] by inserting a part of his body and/or an unknown object into the anus of [Ann].
>
> then you shall find the defendant, NICKEY WILLIAMS, guilty of Sexual Battery in Count II of the indictment. . . .

The first two elements – Ann's and Williams' dates of birth – are not in dispute, and a rational trier of fact could find the third element – the sexual penetration of Ann's anus – to be true beyond a reasonable doubt.

¶49.    While there is no statement or testimony from Ann because she was only ten months old at the time of the alleged abuse, Dr. Marcy's medical findings strongly support a finding of sexual battery.  Dr. Marcy explained to the jury, using photographs of Ann's anus taken during his examination of her, that Ann's anus was inflamed and swollen.  He explained that a baby should have linear folds around the anus, radiating out from the middle to the outside, but the swelling and inflammation had caused the folds around Ann's anus to disappear.  Dr. Marcy also testified that a baby's anus should be round, but due to stretching or swelling, Ann's anus was an irregular shape.  In addition, Ann had a Y-shaped fissure (which is a tear in the skin that reveals the raw tissue underneath) outside the anal opening.  Dr. Marcy testified that a very large, hard bowel movement could cause a fissure, but that if it did, it would tend to tear the inside of the anal opening.  He explained that the fissure on Ann's anus, which extended well outside the anal opening, was more likely caused by something being pushed *into* the anus.  The fissure on Ann's anus would be more consistent with digital penetration than with a bowel movement, he elaborated.  Based solely on his physical exam of Ann and not considering any other evidence, such as the evidence indicating that Jane was sexually abused, Dr. Marcy concluded that Ann's anal injuries were consistent with anal penetration and it was "probable" – the next-to-highest level of suspicion – that Ann had been sexually abused.

21

¶50. While Dr. Marcy may not have testified that Ann's injuries were consistent with sexual abuse "to a reasonable degree of medical certainty," as he did regarding Jane's injuries, his testimony and findings suggest that Ann's injuries were even more indicative of sexual abuse than Jane's were. Dr. Marcy concluded that, based solely on the physical evidence, it was "possible" that Jane had been sexually abused, but consideration of other factors, including Jane's allegations against Williams, led him conclude that it was "probable" that Jane had been sexually abused. In contrast, Dr. Marcy was able to conclude that it was "probable" that Ann had been sexually abused based solely on the physical evidence – i.e., without consideration of any other factors. Therefore, there is no reason to believe that, had Dr. Marcy been asked to phrase his findings regarding Ann in terms of "reasonable degree of medical certainty," Dr. Marcy would not have stated that Ann too was sexually abused "to a reasonable degree of medical certainty."

¶51. The majority states that Dr. Marcy "couched his opinion [regarding Ann] in terms of *suspicion of probability*, which, standing alone, absent additional corroborating evidence, is insufficient in a criminal case." First, the majority is taking the words "suspicion of probable," stated in Dr. Marcy's testimony, out of context. As can be seen in the quoted portion of Dr. Marcy's testimony discussing Ann included in the majority opinion, Dr. Marcy stated, "I came to the next to highest level of suspicion of probable." In other words, of the "four levels of suspicion of child abuse" – "unlikely, possible, probable, and definite" – Dr. Marcy concluded that a suspicion-level classification of "probable" was most appropriate, given Ann's injuries. Second, the majority's conclusion that Dr. Marcy "couched his opinion [regarding Ann] in terms of *suspicion of probability*, which, standing alone, absent additional

22

corroborating evidence, is insufficient in a criminal case" is unsound in that Dr. Marcy also couched his opinion *regarding Jane* in terms of "suspicion of probability." As noted above, Dr. Marcy found that it was "probable" (not "definite") that Jane had been sexually abused (yet the majority concludes that there was sufficiently weighty evidence to convict Williams for sexual battery of Jane).

¶52. In summary, the majority is misconstruing Dr. Marcy's testimony and also placing more significance than is justified on Dr. Marcy's stating that Jane's injuries were consistent with sexual abuse "to a reasonable degree of medical certainty." The majority itself notes that an expert need not use the phrase "to a reasonable degree of medical certainty" in describing his findings.

¶53. The majority states that "[t]he only evidence that Ann was sexually abused was Dr. Marcy's testimony." However, in addition to the medical evidence, there is the fact that, from Ann's birth until she was placed in foster care at ten months of age, Ann was cared for almost exclusively by only three individuals: Williams, Kimberly Williams, and Kimberly's grandmother, Iris Culver, all of whom testified at the trial and denied sexually abusing Ann. Both Kimberly and Kimberly's grandmother testified that they had never inserted any object into Ann's anus. Kimberly explained that, before Ann was placed in foster care, Williams was frequently left alone with Ann when Kimberly was working or out-of-town, which was often. The only explanation Williams offered regarding the condition of Ann's anus was that Ann's baby formula caused her to be constipated and then to have large, hard bowel movements. As mentioned, Dr. Marcy testified that the fissure on Ann's anus was more consistent with something being pushed *into* the anus than with a bowel movement.

23

¶54. In addition, while certainly not determinative of whether Ann was sexually abused, Ms. Smith, Ann and Jane's therapeutic foster mother, testified that when Ann was first placed with her, Ann "had no emotion" but now "she's wide open" and "has blossomed."

¶55. The jury heard the medical evidence and the testimony of the three individuals who had cared for Ann before she was placed in foster care. Based on the testimony presented and their observations of the witnesses, the jurors came not to believe Williams' denial of guilt nor his explanation for Ann's anal injuries. As stated above, it is not for this Court to "pass upon the credibility of witnesses and, where the evidence justifies a verdict, it must be accepted as having been found worthy of belief." *Massey*, 992 So. 2d at 1163. Thus, based solely on evidence presented at trial that was specific to Ann, and viewing it in the light most favorable to the prosecution, a rational trier of fact could have found that the elements of sexual battery of Ann were established beyond a reasonable doubt.

¶56. Therefore, I concur regarding issues "two" through "seven," but must dissent regarding issue "one" because I conclude that there was sufficient evidence to support the jury's verdict that Williams had sexually battered Ann. Accordingly, I would affirm the judgment of the trial court, convicting Williams on both counts of sexual battery.

**RANDOLPH, CHANDLER AND PIERCE, JJ., JOIN THIS OPINION.**