# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-01567-COA

**DONTE SHEPARD A/K/A DONTE MEVALONE SHEPARD A/K/A DONTE M. SHEPARD**                    APPELLANT

v.

**STATE OF MISSISSIPPI**                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 09/22/2016 |
| TRIAL JUDGE: | HON. JEFF WEILL SR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALICIA M. AINSWORTH |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED: 01/16/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., BARNES AND FAIR, JJ.**

**GRIFFIS, P.J., FOR THE COURT:**

¶1.    Shepard appeals his capital-murder conviction and life sentence.  We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.    On November 17, 2013, at 9:33 p.m., Jackson police were dispatched to a residence on Randall Street about a possible shooting.  The responding officer found the front door of the residence open and Tony Brown lying just inside on the floor of the living room bleeding, mortally wounded, and unable to speak.  Brown had called 911 himself and was holding

money in one hand and a cell phone in the other.

¶3. Brown passed away while ambulance attendants were preparing him for transport. He had suffered nine gunshot wounds. One projectile was recovered from Brown's abdomen during the autopsy.

¶4. There was evidence of forced entry into Brown's house. Burglar bars on one of the windows had been tampered with, and the window was forced open. Additionally, a crowbar was found on the hood of a car parked near the opened window, and there were footprints on the hood of the car. The foot impressions were insufficient for forensic comparison, and no usable fingerprints were found on the crowbar.

¶5. Investigators found multiple spent .40-caliber shell casings inside Brown's house in various rooms and bullet holes throughout the house. Brown's bedroom was in disarray, and drawers appeared to have been rifled through, indicating a burglary.

¶6. On November 20, 2013, detectives with the Jackson Police Department interviewed Willie Thomas, who was thirteen years old at the time of the incident. In his recorded interview, Thomas told the police that he was walking home from the barbershop and was right by the pathway in front of Brown's house when he heard gunshots. Thomas stated he saw three guys, later identified as Shepard, Jordan Johnson, and Lucious Perkins, running from the house.

¶7. Thomas stated that Johnson and Perkins ran through a field and jumped a fence. Thomas heard the man identified as Perkins say something about having to "get that money."

¶8. According to Thomas, Shepard initially ran, but then returned to the scene. Thomas

2

stated that before the police arrived, Shepard was hiding near an abandoned house. Thomas explained that Shepard was in the "cut" or "look[-]through pathway" and was on the phone. Thomas agreed that Shepard was "looking out" for the other guys. After the police arrived on the scene, Shepard came out.

¶9. Additionally, Thomas explained that Shepard knew Brown and that Shepard had previously broken into Brown's house. When Brown confronted Shepard about it, Brown and Shepard exchanged verbal death threats. Thomas advised that the confrontation occurred on the day of the shooting at 6:05 p.m.

¶10. During the interview, Thomas was given photo lineups and identified Shepard, Johnson, and Perkins as the three men he saw the night of the shooting. Thomas advised that Johnson and Perkins were in Brown's house, but Shepard was outside, on the phone, "looking out." Thomas wrote on the photo lineups and identified which man was the shooter. Specifically, Thomas wrote, "this man was sho[o]ting at him," and "this man was sho[o]ting the man [in] the back."

¶11. Based on Thomas's recorded statement, Shepard, Johnson, and Perkins were arrested. Two .40-caliber semiautomatic pistols were recovered from Johnson's house. A ballistics comparison was conducted, which showed that projectiles recovered from Brown's house and the autopsy were fired from one of the pistols in Johnson's possession.

¶12. Shepard, Johnson, and Perkins were subsequently indicted on the charge of capital murder. The indictment charged Shepard as follows:

> [O]n or about November 17, 2013[,] while acting in concert with and/or aiding, abetting, assisting[,] or encouraging another or others, [Shepard] did

3

willfully, unlawfully, and feloniously kill Tony Brown, a human being, without the authority of law, with or without any design to effect death while and when engaged in the commission of the crime of burglary of a dwelling, or any attempt to commit such felony, by shooting the said[] Tony Brown with a firearm, in violation of Mississippi Code Annotated [section] 97-3-19(2)(e) (1972).

¶13. At trial, the State's key witness was Thomas. Thomas testified that he was on the corner of Randall Street and Martin Luther King Jr. Drive when he heard gunshots. He saw three guys, including Shepard, who "was standing outside watching out." Thomas stated that at the time of the gunshots, Shepard was standing in the front of Brown's house. The other two guys, Johnson and Perkins, ran out of the house and went through the pathway near Brown's house.

¶14. On cross-examination, Thomas was asked to clarify whether he saw Shepard hiding in an abandoned house close to the scene of the crime. Thomas explained that it was not an abandoned house, but two abandoned buildings that were close together with "a little space open." Thomas stated he saw Shepard on the street between the abandoned buildings and that Shepard was on the phone. Thomas further stated no one could see Shepard because the buildings were so close together. Thomas testified that when the police arrived, Shepard walked past the police, spoke to one of the officers, and then left.

¶15. During Thomas's cross-examination, defense counsel played portions of Thomas's recorded interview with the police. Thomas acknowledged that it was his cousin who told him that Shepard had previously broken into Brown's house and had exchanged death threats with Brown. Thomas admitted that he did not actually hear Brown and Shepard exchange threats.

4

¶16. Regarding the photo lineups, Thomas testified that despite his notations, he did not see who shot Brown. Thomas acknowledged that what he wrote on the photo lineups "wasn't exactly the truth." Defense counsel then asked whether there was anything else that Thomas needed to clarify, to which Thomas replied, "no, sir."

¶17. On redirect, Thomas was adamant that at the time he heard gunshots, he saw Shepard standing by the abandoned buildings, "looking out." Thomas testified that following the shooting, Shepard "stayed, then he left, then he came back to the scene."

¶18. Detective Daryl Owens with the Jackson Police Department testified that he observed Shepard at the scene of the crime, standing around after the shooting. Detective Owens explained that in his experience as a detective, he had seen defendants return to the scene of the crime.

¶19. Shepard did not testify at trial, but called four witnesses on his behalf. Rosalind Howard testified that Shepard was with her on the day of the shooting. Howard explained that she and Shepard went to the grocery store. Shortly after they returned from the grocery store, Shepard, Howard's niece, Hazel, and Tommie Lewis went to the store for snacks. Howard testified that when Shepard, Hazel, and Lewis returned to her house, they were talking about an encounter Shepard had had with Brown "a couple [of] days before." According to Howard, Shepard said that Brown had confronted him and had heard that he had been in Brown's house. Shepard told Brown that he did not know what Brown was talking about. However, Howard testified that Shepard admitted to her that he had broken into Brown's house in the past.

¶20.    At some point, Shepard spilled hot sauce on his pants and left Howard's house to change clothes.  Although Howard did not recall what time that occurred, she testified that it was dark outside.  Howard stated Shepard left by himself and was gone no more than ten or fifteen minutes.  Howard acknowledged that Shepard could have committed the crime during the time that he had left her house.

¶21.    Lewis testified that around 9:38 to 9:40 p.m., he, Hazel, and Shepard were walking out of the door to go to the store when they heard two or three gunshots.  They proceeded to the store to get there before it closed at 10:00 p.m.  When they returned to Howard's house, they saw a news report about a shooting on Randall Street.

¶22.    On cross-examination, Lewis initially stated that Shepard was with him the whole night. However, upon further examination, Lewis acknowledged that Shepard left Howard's house to get some clothes, but was gone "no longer than five minutes."

¶23.    Codefendant Johnson, who pled guilty to the murder of Brown,[1] testified that on November 17, 2013, he and a man named "Little John" got a crowbar from Perkins's house and used the crowbar to pry open the window to Brown's house.  Little John entered the house first, followed by Johnson.  After Johnson took items from Brown's house, he climbed back out the window.  At that time, Brown pulled up in his vehicle, ran straight toward the front door, and started yelling, "I got you MF now."  Johnson stated he then heard eight or nine gunshots and "jumped back across the fence and ran back through the pathway."

¶24.    Johnson stated he was familiar with the pathway near Brown's house.  Johnson

---

[1] At trial, Johnson testified he did not shoot or kill Brown.

described the pathway as "a little grass field" and said it was close to Brown's house, on the side of the house. Johnson testified that he used the pathway to get to Brown's house.

¶25.  Additionally, Johnson testified that he did not see or speak to Shepard on the day of the crime, and did not plan or conspire with Shepard prior to the crime. However, Johnson admitted that following his arrest, he lied to the police and told them he did know what had happened. Moreover, Johnson admitted he never told the police about Little John.

¶26.  Codefendant Perkins pled guilty to accessory before the fact to burglary. Perkins testified that on November 17, 2013, around 8:30 or 9:00 p.m., Johnson and Little John came to his house and asked for a crowbar. Perkins stated he heard gunshots approximately twenty to thirty minutes later. Perkins further testified he did not see Shepard on the day of the shooting.

¶27.  On cross-examination, Perkins acknowledged that during his plea hearing, he never mentioned Little John. Instead, during his plea, Perkins advised the circuit court, under oath, that he gave the crowbar to Johnson. When asked to explain, Perkins responded that at the time he pled guilty, he simply did not remember Little John. Perkins agreed that he did not tell the same "truth" at trial as he told during his plea hearing.

¶28.  In rebuttal, the State presented Detective Owens, who interviewed Shepard after his arrest.[2] During the recorded interview, Shepard advised Detective Owens that he was at Howard's house on November 17, 2013. Shepard further advised that he, Hazel, and Lewis

---

[2] Shepard was read his *Miranda* rights and signed a waiver of those rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966). Additionally, his counsel was present during the interview.

went to the store around 7:00 p.m. Shepard denied going to the grocery store with Howard.

¶29. Shepard stated he did not hear gunshots on the night of the shooting. Shepard learned of the shooting from a phone call he received when he returned from the store, which, according to Shepard, was around 8:00 p.m. However, as Detective Owens noted, the evidence showed the shooting did not occur until 9:33 p.m.

¶30. Shepard further stated that although he knew of Brown, he had never spoken to him. Shepard advised he did not have any involvement with Brown's house, Johnson, or Perkins on November 17, 2013.

¶31. Following a jury trial, Shepard was found guilty of capital murder. He was sentenced to serve life in the custody of the Mississippi Department of Corrections, without the possibility of parole. Shepard subsequently filed a motion for a judgment notwithstanding the verdict or, in the alternative, a motion for a new trial, which the circuit court denied.

¶32. Shepard now appeals and raises five assignments of error: (1) the evidence was insufficient to support his conviction, (2) the verdict was contrary to the weight of the evidence, (3) the circuit court erred in refusing his circumstantial-evidence jury instruction, (4) the circuit court erred in sustaining the State's reverse-*Batson* challenge,[3] and (5) he received ineffective assistance of counsel.

ANALYSIS

I.      *Sufficiency of the Evidence*

¶33. Shepard first argues the evidence was insufficient to support his conviction. Shepard

---

[3] *See Batson v. Kentucky*, 476 U.S. 79 (1986).

8

claims Thomas's testimony "created nothing more than an inference that [he] was merely present near the scene of the crime and does not support any rational conclusion beyond a reasonable doubt that [he] was an accomplice, before or after the fact, to the burglary or homicide."

¶34.    In considering whether the evidence is sufficient to sustain a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Williams v. State*, 35 So. 3d 480, 485 (¶16) (Miss. 2010) (citation omitted). Where the facts and inferences "point in favor of the defendant on any element of the offense with sufficient force that reasonable [jurors] could not have found beyond a reasonable doubt that the defendant was guilty, the proper remedy is for the appellate court to reverse and render." *Id*. (citations omitted). However, if "reasonable fair-minded [jurors] in the exercise of impartial judgment might reach different conclusions on every element of the offense, the evidence will be deemed to have been sufficient." *Id*. (citations omitted).

¶35.    The indictment alleged that Shepard, "while acting in concert with and/or aiding, abetting, assisting[,] or encouraging another or others, did willfully, unlawfully, and feloniously kill Brown . . . while and when engaged in the commission of the crime of burglary of a dwelling." "One who aids and abets another in the commission of a crime is guilty as a principal." *Hughes v. State*, 983 So. 2d 270, 276 (¶14) (Miss. 2008). "To aid and abet the commission of a felony, 'one must do something that will incite, encourage, or assist the actual perpetrator in the commission of the crime or participate in the design of the

9

felony.'" *Id.* (quoting *Vaughn v. State*, 712 So. 2d 721, 724 (¶11) (Miss. 1998)). "[S]ome degree of participation in the criminal act must be shown in order to establish any criminal liability." *Id.* at 277 (¶16).

¶36. Here, in his statement to the police, Thomas stated Shepard was standing in the pathway or cut-through near Brown's house and was on the phone. Thomas agreed that Shepard was "looking out" for the other guys in the house.

¶37. At trial, Thomas again testified that he saw three guys at Brown's house, including Shepard, who was standing outside, on the phone, "watching out." Thomas further testified that Shepard left the scene after gunshots were fired, but subsequently returned. This testimony was confirmed by Detective Owens, who testified that he too saw Shepard at the scene following the shooting.

¶38. Regarding Johnson's involvement, Thomas testified that following the shooting, he saw Johnson run through a field and jump a fence. This testimony was consistent with Johnson's testimony, who said that following the gunshots, he jumped the fence and ran through the pathway, which he described as a "grass field."

¶39. Although Johnson testified that Shepard was not involved in the crimes, he confirmed the existence of the pathway and its proximity to Brown's house. Moreover, Johnson testified that he utilized the pathway to break into Brown's house. Importantly, it was this pathway where Thomas stated he saw Shepard standing, watching out.

¶40. While Shepard denied any involvement in the crimes, he advised the police that he returned to Howard's house around 8:00 p.m. According to Howard, Shepard subsequently

10

left her house to change clothes. Detective Owens testified that Shepard would have had sufficient time to get from Howard's house to Brown's house prior to the shooting at 9:33 p.m.

¶41. Overall, considering the evidence in the light most favorable to the State, we find sufficient evidence existed to support Shepard's conviction. Indeed, sufficient evidence was presented to show that Shepard assisted or participated in the commission of the felony. *Id*. Thus, Shepard's motion for a judgment notwithstanding the verdict was properly denied.

## II. *Weight of the Evidence*

¶42. "In reviewing the denial of a motion for a new trial 'based on an objection to the weight of the evidence,' this Court 'will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.'" *Kirk v. State*, 160 So. 3d 685, 697 (¶31) (Miss. 2015) (citation omitted). The evidence is weighed in the light most favorable to the verdict. *Id*. "A new trial should be granted on the basis of the weight of the evidence 'only in exceptional circumstances, when the evidence weighs heavily against the jury's verdict.'" *Hughes*, 983 So. 2d at 277 (¶22) (quoting *Wilson v. State*, 936 So. 2d 357, 363 (¶16) (Miss. 2006)).

¶43. Shepard argues the verdict was contrary to the weight of the evidence since Thomas's testimony was inconsistent, unreasonable, and substantially impeached. "Conflicts in the evidence are for the jury to resolve." *Williams v. State*, 64 So. 3d 1029, 1033 (¶13) (Miss. Ct. App. 2011). "Any factual disputes are properly resolved by the jury and do not mandate a new trial." *Sneed v. State*, 31 So. 3d 33, 43 (¶33) (Miss. Ct. App. 2009) (quoting *Moore*

11

*v. State*, 859 So. 2d 379, 385 (¶26) (Miss. 2003)).

¶44.    Although Thomas's statement to the police and his subsequent trial testimony differed at times, the testimony was not substantially inconsistent.  Thomas maintained throughout litigation that at the time of the gunshots, he saw Shepard standing outside of Brown's house, on the phone, "watching out."  While Thomas acknowledged certain lies during his testimony, it was for the jury, not this Court, to weigh the evidence and the credibility of the witnesses and to resolve the issues.  *See Williams,* 64 So. 3d at 1033 (¶13).

¶45.    Overall, we do not find Thomas's testimony was so inconsistent and implausible that, "when considered together, it [was] an exceedingly improbable and unreasonable story." *Ross v. State*, 954 So. 2d 968, 1017-18 (¶135) (Miss. 2007).  Moreover, having considered the evidence presented, we do not find the verdict to be so contrary to the overwhelming weight of the evidence that to allow the verdict to stand would sanction an unconscionable injustice.  Accordingly, the circuit court did not err in denying Shepard's motion for a new trial.

### III.    Circumstantial-Evidence Jury Instruction

¶46.    Shepard next argues the circuit court erred in refusing his requested circumstantial-evidence jury instruction.  "This court reviews a grant or denial of a jury instruction under an abuse-of-discretion standard."  *McInnis v. State*, 61 So. 3d 872, 875 (¶10) (Miss. 2011).

¶47.    "Circumstantial evidence is 'evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact does exist.'"  *Id.* at (¶11) (quoting *Keys v. State*, 478 So. 2d 266, 268 (Miss. 1985)).  Where all evidence tending to

prove guilt is circumstantial, the circuit court "must grant a jury instruction that every reasonable hypothesis other than that of guilt must be excluded in order to convict." *Kirkwood v. State*, 52 So. 3d 1184, 1186 (¶10) (Miss. 2011). "While evidence does not always fall neatly into one category, examples of direct evidence include . . . eyewitness testimony 'to the gravamen of the offense charged.'" *Id.* at 1187 (¶10) (quoting *Mack v. State*, 481 So. 2d 793, 795 (Miss. 1985)).

¶48. Here, Thomas testified that at the time he heard gunshots, he saw Shepard outside of Brown's house, on the phone, "watching out." He had previously told the police that he saw Shepard in the pathway on the phone, and agreed that Shepard was looking out for the other guys.

¶49. Thomas's eyewitness testimony is direct evidence of Shepard's involvement in the crime. Thus, this case is not based solely on circumstantial evidence. Accordingly, the circuit court did not abuse its discretion in refusing Shepard's circumstantial-evidence jury instruction.

### IV. Reverse-Batson *Challenge*

¶50. In *Batson v. Kentucky*, 476 U.S. 79, 82-84 (1986), the United States Supreme Court held that the prosecution may not use peremptory strikes in a discriminatory manner. The Court subsequently found that *Batson* applies to both prosecutors and defendants. *Georgia v. McCollum*, 505 U.S. 42, 59 (1992). "[W]hen the *Batson* analysis is used against the defense, this Court has referred to it as a reverse-*Batson* challenge." *Hardison v. State*, 94 So. 3d 1092, 1097 (¶17) (Miss. 2012).

13

¶51.    During jury selection, the State raised a reverse-*Batson* challenge after the defense struck four white males from the jury.[4] On appeal, Shepard takes issue with only one of the individuals, William Barber, and argues the circuit court failed to conduct the proper *Batson* analysis.

¶52.    Circuit courts are afforded great deference in their determination of *Batson* issues. *Hatten v. State*, 628 So. 2d 294, 298 (Miss. 1993). A circuit court's determination of a *Batson* issue will not be reversed on appeal unless its findings are clearly erroneous. *Id*.

¶53.    A *Batson* challenge is analyzed using a three-part test:

> First, the party objecting to the peremptory strike of a potential juror must make a prima facie showing that race was the criterion for the strike. Second, upon such a showing, the burden shifts to the [opposing party] to articulate a race-neutral reason for excluding that particular juror. Finally, after a race-neutral explanation has been offered . . . , the [circuit] court must determine whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the peremptory strike, i.e., that the reason given was a pretext for discrimination.

*Hardison*, 94 So. 3d at 1097-98 (¶17) (citation and emphasis omitted).

### A.    Prima Facie Showing

¶54.    To establish a prima facie case, the opponent of a peremptory strike must establish that:

> (1) the opponent is a member of a cognizable class, such as a racial group; (2) the proponent has used peremptory strikes to remove venire members in that class; and (3) the facts and circumstances give rise to an inference that the proponent used peremptory strikes to purposefully remove individuals of that class.

*Id*. at 1098 (¶18).

---

[4] Shepard is an African American male.

14

¶55. Based on this Court's highly deferential standard, we cannot say that the circuit court erred in finding a prima facie case of racial discrimination. The record shows that while Shepard accepted as a juror the only white venire member on the first panel, he exercised peremptory strikes against all but one white venire member on the second panel. Specifically, of the four viable white venire members on the second panel, Shepard exercised peremptory strikes against three. Additionally, of the eight viable venire members on the third panel, only one was white, and was struck by Shepard.[5]

### B. Race-Neutral Reasons

¶56. In his initial response to the State's challenge of Barber, defense counsel stated that Barber did not respond to any questions during voir dire and "laughed too many times at [the prosecutor's] jokes and did not like [his] jokes at all." Additionally, defense counsel explained that Barber had a master's degree and may not be able to "conceptualize or even give proper context to what's going on [in Brown's neighborhood]."

¶57. Demeanor, educational background, and employment history are sufficient race-neutral reasons for striking venire members. *Davis v. State*, 660 So. 2d 1228, 1242 (Miss. 1995). When a party offers a valid race-neutral reason, the circuit court "must allow the strike unless the other party demonstrates that the valid race-neutral reason was a pretext for discrimination." *Hardison*, 94 So. 3d at 1100 (¶28).

¶58. Here, although the circuit court did not specifically find that Shepard's reasons for the peremptory strike were race-neutral, the record shows the court continued to the third part

---

[5] The record shows that the first panel was Panel 9, the second panel was Panel 10, and the third panel was Panel 11.

of the *Batson* analysis and required the State to respond in an effort to determine whether the reasons were pretextual. We do not find the circuit court's conduct to be improper.

### C. Pretext

¶59. In response to Shepard's race-neutral reasons, the prosecutor stated he did not recall Barber "liking [his] material any more so than counsel opposite's" and noted that Barber was attentive, "paying attention to the questions, responding with a nod or a head shake as asked." Additionally, in response to defense counsel's statement that Barber failed to respond to any questions during voir dire, the prosecutor noted that defense counsel had accepted other individuals as jurors who did not respond to questions or participate during voir dire, including at least one black male.

¶60. As far as Barber's master's degree and his alleged inability to relate to or understand the neighborhood in which the crime occurred, the prosecutor noted that at no time did defense counsel ask Barber what type of work he did or question the field in which Barber had his degree. Moreover, when asked whether he knew where Barber lived, defense counsel stated he did not recall, but thought Barber lived in Clinton. However, Barber was in fact a resident of Jackson.

¶61. The circuit court found Shepard's reasons for striking Barber were pretextual and an effort to engage in purposeful discrimination. Based on our review of the record and given the great deference afforded to the circuit court, we do not find the circuit court's determination was clearly erroneous. The record indicates Shepard's reasons for striking Barber were a thinly veiled way of saying that Barber, an educated white male, would be

16

unable to relate to or understand a black neighborhood. However, simply because Barber has a master's degree in some unknown field does not make him incapable of understanding a neighborhood such as Brown's. Thus, the circuit court's conclusion that such an explanation was a pretext for discrimination is not reversible error.

### V.    *Ineffective Assistance of Counsel*

¶62.    Shepard last argues he received ineffective assistance of counsel. Specifically, Shepard claims his counsel was ineffective for: (1) "eliciting testimony [through Thomas and Howard] that he had been accused of and possibl[y] admitted to burglarizing Brown's house at a previous time" and (2) failing to request an alibi instruction. To prove ineffective assistance of counsel, Shepard must show: (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. To overcome this presumption, Shepard "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

¶63.    "[G]enerally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Dartez v. State*, 177 So. 3d 420, 422-23 (¶18) (Miss. 2015) (citation omitted). "We may, however, address an ineffectiveness claim on appeal if the presented issues are based on facts fully apparent from the record." *Id.* at 423 (¶18).

¶64.    Here, Shepard's ineffective-assistance-of-counsel claim is based on facts not fully apparent from the record. Accordingly, we are unable to adequately and properly address the

claim on direct appeal. As a result, we affirm the circuit court's judgment and deny relief preserving Shepard's right to pursue his claim through a petition for post-conviction collateral relief.

## CONCLUSION

¶65. We find Shepard's assignments of error on appeal are without merit. Accordingly, we affirm.

¶66. **AFFIRMED**.

**LEE, C.J., BARNES, CARLTON, FAIR, GREENLEE AND TINDELL, JJ., CONCUR. WILSON, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. IRVING, P.J., AND WESTBROOKS, J., CONCUR IN PART AND DISSENT IN PART WITHOUT SEPARATE WRITTEN OPINION.**