# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00596-COA

**REGINALD MARTE'Z FOX A/K/A REGINALD MARTEZ FOX**                                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                    **APPELLEE**

DATE OF JUDGMENT:              05/26/2021
TRIAL JUDGE:                           HON. MICHAEL M. TAYLOR
COURT FROM WHICH APPEALED:   LINCOLN COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:      WARREN MARTIN JR.
                                              REGINALD MARTE'Z FOX (PRO SE)
ATTORNEY FOR APPELLEE:         OFFICE OF THE ATTORNEY GENERAL
                                              BY: ALEXANDRA LEBRON
DISTRICT ATTORNEY:                DEE BATES
NATURE OF THE CASE:              CRIMINAL - FELONY
DISPOSITION:                          AFFIRMED - 11/26/2024
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McDONALD AND EMFINGER, JJ.**

**McDONALD, J., FOR THE COURT**:

¶1.    Reginald Marte'z Fox appeals his Lincoln County Circuit Court jury conviction of one count of molestation (specifically, for "touching, handling, etc. a child for lustful purposes") and two counts of sexual battery of a minor, as well as his sentence of fifteen years to serve in the custody of the Mississippi Department of Corrections (MDOC) for the molestation conviction and twenty-five years in custody, with five years suspended and twenty years to serve, for the two counts of sexual battery, with all sentences set to run concurrently, followed by five years of post-release supervision.  Fox raises numerous issues on appeal, including ineffective assistance of counsel, the circuit court's alleged erroneous admission

of evidence and expert testimony, and the circuit court's denial of Fox's motions for a directed verdict and judgment notwithstanding the verdict or, in the alternative, a new trial. Having reviewed the record and the arguments raised by Fox and his counsel, we affirm Fox's convictions and sentences.

**FACTS**

¶2.     In 2016, Fox anticipated proposing to his intended fiancé, Felicia Simon, a co-worker and fellow truck driver. To prepare a home for himself and Felicia, Fox began a renovation of the trailer he owned while he stayed at an America's Best Inn hotel in Brookhaven.

¶3.     This would be Fox's first marriage, and he had no children, though he had four nieces and seven nephews whom he treated as his own. Fox often rewarded his nieces and nephews with shoes, clothes, or money for good behavior or academic achievement. His family was close, and they often socialized with cookouts and vacations.

¶4.     One of Fox's nieces, D.S.,[1] was newer to the family. Fox's brother Derrick only learned in 2012 that he had fathered this child during an encounter with D.S.'s mother Chasity in 2000. Although Chasity suspected Derrick was D.S.'s father, she did not tell him until the child was older. Derrick had a DNA test to confirm his paternity. Thereafter, D.S. was welcomed into the Fox family and visited often at her grandparents' home, where she would sometimes interact with Fox.

¶5.     D.S. later recounted that when she was fifteen in October 2016, during one of her visits with her grandparents, Fox took her with him to his unfinished mobile home to get

---

[1] We use initials when needed to protect the minor children's privacy.

some charcoal for a barbeque. When Fox took a long time coming back, D.S. went inside. She said Fox shut the door behind her, took her to his bedroom, and put her on his air mattress. She said he pulled up her shirt and started sucking her breasts. He then pulled her pants down and inserted his fingers into her vagina.

¶6. D.S. said they returned to her grandmother's home, and later that day, instead of taking her home, Fox took her to the America's Best Inn hotel. D.S. said she spoke to the desk clerk to get the wi-fi password. She and Fox then went to the room, where she played on her phone until Fox went to sleep. After midnight, she woke up because Fox was again inserting his fingers into her vagina. D.S. said Fox apologized and told her, "I'm sorry. I'm a pervert." Still, Fox told her not to say anything to anyone, or it would break up the family. He also mentioned to her an incident where an entire family had been murdered by a man when it came out that he had been abusing one of his daughters. Understanding this as a veiled threat, D.S. mentioned nothing about Fox's abuse at the time.

¶7. During this time, D.S.'s mother Chasity and Fox had a sexual relationship and met at the America's Best Inn several times in 2016 and early 2017. Chasity said he paid her money for sex. However, Fox ended the relationship when he proposed to Felicia in May 2017.

¶8. On May 19, 2017, Chasity learned of the alleged abuse from a friend whose daughter told her that D.S. had confided in her that she had been molested. Chasity took D.S. to meet with Master Sergeant Damien Gatlin at the Lincoln County Sheriff's Department. Chasity told Gatlin what the child had said about Fox sexually abusing her. Gatlin investigated the matter further by having the child interviewed by the Children's Advocacy Center (CAC), interviewing D.S.'s friends, and securing information from the hotel personnel.

3

### The Indictment

¶9.     On March 1, 2019, Fox was indicted on two counts of sexual battery in violation of Mississippi Code Annotated section 97-3-95 (Rev. 2014),[2] and one count of "touching, handling, etc. a child for lustful purposes" in violation of Mississippi Code Annotated section 97-5-23 (Supp. 2015).[3]  The indictment alleged in Count I that on October 14, 2016, Fox

---

[2]  Section 97-3-95 (sexual battery) provides:

(1) A person is guilty of sexual battery if he or she engages in sexual penetration with:
    (a) Another person without his or her consent;
    (b) A mentally defective, mentally incapacitated or physically helpless person;
    (c) A child at least fourteen (14) but under sixteen (16) years of age, if the person is thirty-six (36) or more months older than the child; or
    (d) A child under the age of fourteen (14) years of age, if the person is twenty-four (24) or more months older than the child.
(2) A person is guilty of sexual battery if he or she engages in sexual penetration with a child under the age of eighteen (18) years if the person is in a position of trust or authority over the child including without limitation the child's teacher, counselor, physician, psychiatrist, psychologist, minister, priest, physical therapist, chiropractor, legal guardian, parent, stepparent, aunt, uncle, scout leader or coach.

[3]  Section 97-5-23 (molestation) provides:

(1) Any person above the age of eighteen (18) years, who, for the purpose of gratifying his or her lust, or indulging his or her depraved licentious sexual desires, shall handle, touch or rub with hands or any part of his or her body or any member thereof, or with any object, any child under the age of sixteen (16) years, with or without the child's consent, or a mentally defective, mentally incapacitated or physically helpless person as defined in Section 97-3-97, shall be guilty of a felony and, upon conviction thereof, shall be fined in a sum not less than One Thousand Dollars ($1,000.00) nor more than Five Thousand Dollars ($5,000.00), or be committed to the custody of the State Department of Corrections not less than two (2) years nor more than fifteen (15) years, or be punished by both such fine and imprisonment, at the discretion of the court.

feloniously touched his mouth to D.S.'s breast for the purpose of gratifying his lust in violation of section 97-5-23. In Count II, the indictment charged that on the same day, October 14, 2016, Fox sexually penetrated D.S. by inserting his fingers into her vagina in violation of section 97-3-95. As Count III, the indictment further charged Fox with sexual penetration of D.S. by inserting his finger or fingers into the vagina of D.S. on another occasion, October 15, 2016, in violation of section 97-3-95.

¶10. The matter was set for trial several times and continued for various reasons, including Fox's attorney's need to obtain a copy of the videotaped interview with the child, counsel's health issues, and conflicts with trial dates in other cases. On March 25, 2021, additional counsel entered an appearance on behalf of Fox.

*Trial*

---

(2) Any person above the age of eighteen (18) years, who, for the purpose of gratifying his or her lust, or indulging his or her depraved licentious sexual desires, shall handle, touch or rub with hands or any part of his or her body or any member thereof, any child younger than himself or herself and under the age of eighteen (18) years who is not such person's spouse, with or without the child's consent, when the person occupies a position of trust or authority over the child shall be guilty of a felony and, upon conviction thereof, shall be fined in a sum not less than One Thousand Dollars ($1,000.00) nor more than Five Thousand Dollars ($5,000.00), or be committed to the custody of the State Department of Corrections not less than two (2) years nor more than fifteen (15) years, or be punished by both such fine and imprisonment, at the discretion of the court. A person in a position of trust or authority over a child includes without limitation a child's teacher, counselor, physician, psychiatrist, psychologist, minister, priest, physical therapist, chiropractor, legal guardian, parent, stepparent, aunt, uncle, scout leader or coach.
(3) Upon a second conviction for an offense under this section or a substantially similar offense under the laws of another state, the person so convicted shall be punished by commitment to the State Department of Corrections for a term not to exceed twenty (20) years.

5

¶11. Trial began on May 11, 2021. Prior to the start of testimony, Fox's defense counsel approached the bench and indicated that he had a "proffer" to make. Basically, he wanted the court to confirm with Fox (1) that defense counsel had gone through all the evidence in the file (2) that Fox had been advised about his option to enter a plea, and (3) that due to the defense counsel's having symptoms of a delayed response from COVID-19, another attorney had been retained to assist and had been working on the case for two months. Defense counsel wanted confirmation that Fox agreed and that he wanted to go forward with a trial. The court asked Fox, and he said he was satisfied and wanted to go forward.

*Witnesses for the State*

*Master Sergeant Gatlin*

¶12. The State's first witness was Master Sergeant Gatlin. He prepared a map that showed locations of D.S.'s grandmother's house, Fox's trailer, the place Chasity and D.S. were living in October 2016, and the location of the America's Best Inn hotel. He testified that all were within Lincoln County.

¶13. Gatlin testified that on May 19, 2017, Chasity and D.S. came to his office, and Chasity told him what D.S. had told her about the incidents. Gatlin contacted the Children's Advocacy Center (CAC) to set up an emergency interview with them. Gatlin said he did not speak to the child on that day because under CAC protocol, law enforcement officers are not to interview the child directly. Nor did he participate in the child's videotaped interview with the CAC, although he was present and watched it through closed-circuit tv.[4]

---

[4] The CAC interview was not entered into evidence and does not appear in the record.

¶14.    Gatlin also went to America's Best Inn with D.S. and Chasity. He took pictures of the room (Room 124) D.S. identified as the room where she spent the night with Fox. Gatlin testified that he spoke to the hotel's owner, and obtained a copy of a room receipt in Fox's name with a check-in date of "10/14/16" and a check-out date of "10/15/16." The State showed Gatlin the hotel bill with an attached sworn statement from the hotel's owner, Nayankumar G. Patel. In the statement, entitled "Certificate of Authenticity," Patel affirmed that the attached guest record was made in the course of the regularly conducted business of the hotel and that it was the regular practice of the business to make such records. The State offered the hotel receipt and the affidavit as evidence, and they were entered with no objection from the defense. Gatlin also testified that as part of his investigation, he later spoke to the clerk on duty on October 14, 2016, Paris Primeaux, who confirmed that Fox and the child were both there that day.

¶15.    Gatlin said that Chasity wanted to file charges against Fox on the first day in May 2017, when they came to the department, but he wanted to investigate further and present a case to the grand jury. Nonetheless, Chasity "became a little weary" and filed charges herself in August 2017.

*Marsha Woods Jackson*

¶16.    The State called Marsha Woods Jackson, whose daughter was a friend of D.S. Marsha said that her daughter told her what D.S. had said about Fox touching her. Marsha then told her friend, D.S.'s mother Chasity, what D.S. had told D.C. Marsha said she normally called Chasity every day or every other day. Fox's attorney questioned Marsha

7

from a statement Marsha had given to the police that confirmed the content of her testimony.[5] Fox's attorney then entered it into the evidence. The statement included information that Marsha did not testify about, such as D.S. also saying that Fox threatened to kill her if she told anyone about the incident.

*D.C.*

¶17.   The State next called Marsha's daughter, D.C., who recounted how she was riding the bus home with D.S., who was very quiet. When D.C. pressed her about what was wrong, D.S. started crying and telling her that her uncle (Fox) had molested her and threatened to kill her if she told anyone. D.C. stated that she told her mother, Marsha, what D.S. had said. Fox's attorney cross-examined D.C. with a statement D.C. had given to the police. In it, D.C. said that D.S. had told her about the abuse but that D.C. did not tell her mother, Marsha, right away. On re-direct, D.C. clarified that although she did tell her mother the same day D.S. told her about the abuse, she did not tell her mother everything. On another day, they were driving by D.S.'s house and saw Fox's truck and Chasity's car there. Marsha asked D.C. which uncle had been abusing D.S. That is when D.C. told Marsha everything D.S. had told her. D.C.'s statement, which confirmed her testimony, was entered into evidence.

*Chasity Smith*

¶18.   The State's next witness was Chasity Smith. She testified that D.S. stopped going over to visit her father, Derrick, and others from the Fox family in November 2016. D.S. told

---

[5]   The statement is dated "May 22,_____," but has no year entered. Because Chasity said that she took the child to see Gatlin the day she found out, we assume Marsha's statement was given to Gatlin on May 22, *2017*.

her she just wanted to stay home. Between that time and the date Chasity's mother died in January 2017, Fox would come around and ask if he could take D.S. for a ride or go fishing, but Chasity refused.

¶19. Chasity related how she found out about the abuse, stating that she had taken D.S. to stay with her grandmother when Marsha called and told her that Fox had been "messing with" the child. Chasity said she turned her car around and went to get D.S. She told D.S.'s grandmother that she (Chasity) was pressing charges and then called Fox. She told him the same thing, and he said, "[T]hey ain't got no evidence; they ain't got no DNA." He then said he would stay away from D.S., but Chasity told him she was pressing charges anyway.

¶20. Chasity admitted that she had a sexual relationship with Fox for about six or seven months in 2016. She and he often went to the America's Best Inn as well. Fox paid her to have sex with him. Chasity said she broke off her relationship with Fox when she learned he had "messed" with her daughter. Chasity testified that after the abuse, D.S. would run away from home, Chasity had to call the police, and Child Protection Services came out as well. She said things got physical with D.S. and that she hit D.S. with a switch and with her hand. Chasity testified that she and D.S. went to justice court in August 2017 to press charges against Fox. After doing so, they went back to D.S.'s school and spoke to the counselor who reported the abuse to Child Protection Services.

*Paris Primeaux*

¶21. Next to testify was Paris Primeaux, the front desk clerk at America's Best Inn on the night of October 14, 2016. She knew Fox from being a frequent guest at the hotel. She was shown the receipt from Fox's room rental that night that had the certificate of authenticity

9

attached to it. She identified it as the bill she had generated. She also stated that a young lady was with Fox. She identified the young girl as D.S. from the picture shown to her that was entered into evidence. Primeaux testified that D.S. had come to the desk needing assistance with the Wi-Fi password. On cross-examination, Fox's attorney brought out that Primeaux did not like Fox and some of the sexual remarks he made to her when she worked at the hotel. She said he was a regular at the hotel and a "player." Also, in her social media accounts, Primeaux allegedly was hard on pedophiles and people who abuse their children.

*Ann Houston Craig*

¶22. The State's next witness was Ann Houston Craig, who worked as a mental health therapist at the Southwest Mississippi Children's Advocacy Center in 2017. As a licensed clinical social worker, she was trained to assess mental health issues and diagnoses. She received her bachelor's degree from the University of Mississippi and her master's degree from the University of Southern Mississippi. After two years of clinical supervision, she was able to take the licensure examination with the Mississippi State Board of Examiners for Social Workers and Marriage and Family Therapists. She was licensed, and at the time of the trial in 2021, she had been a practicing therapist for six years. She had been trained in trauma-focused cognitive behavioral therapy, and about sixty to seventy percent of her clients had sought treatment for disorders relating to some traumatic event. About half of that group experienced some sexual assault or abuse. She had testified and been accepted in court three times as an expert in the mental health field specializing in clinical social work and child sexual abuse.

¶23. The State designated Craig as an expert in the field of mental health, specializing in

clinical social work and in child sexual abuse. Fox objected to her acceptance as an expert and questioned her outside of the presence of the jury about her credentials at the time she assessed and treated D.S. and entered Craig's resume into evidence. Craig testified that she initially saw D.S. in June 2017 and treated her until September 2017. Craig said she completed her trauma-focused cognitive behavioral therapy training (TBCBT) while she was working with D.S. This included twelve consultation sessions between November 2016 and August 2017 that were needed for TBCBT certification. Craig then attended a three-day seminar in Huntsville, Alabama, from October 5 to 7, 2017. Craig said that she was supervised by a clinical supervisor while she was treating D.S. Craig explained that although she was a licensed master social worker, to get a *clinical* license, she had to meet with a supervisor for two years, review cases, and go over training materials. She completed this process in 2018.

¶24. Fox objected to Craig's qualifications to be an expert. The circuit court asked the State what opinions it would elicit from Craig. The State indicated that it was going to present testimony about how and when minors disclose abuse, about D.S.'s disclosure of events, and about D.S.'s diagnoses. Ultimately, the court accepted Craig as an expert.

¶25. Craig testified that she first met D.S. in June 2017 when the child came into the CAC for an intake assessment. Craig evaluated her on a "UCLA PTSD Reaction Index" and determined that the child met the symptoms criteria for post-traumatic distress, indicating that D.S. had undergone some traumatic event. D.S. reported the event as the abuse from Fox. Although they started therapy, D.S. did not complete it. Craig further testified to the factors that might affect when a child would report abuse. In D.S.'s case, Craig said that D.S.'s fear

11

that Fox might hurt her and her fear that family members may not believe her or cut her off delayed D.S. reporting the events.

¶26. On cross-examination, Craig admitted that there were other traumatic events that D.S. identified on the UCLA protocol, but Craig did not specify what those were and said that they did not cover those in the six therapy sessions she had with D.S. During that time, D.S. was considering running away from home. Craig knew D.S. and her mother were having arguments at home, but D.S. also wanted to run away because she did not feel safe. At Craig's last session in September 2017, Craig suggested in-patient treatment.

*D.S.*

¶27. At the time she testified, D.S. was nineteen years old; however, at the time of the incidents, she was fifteen.[6] She said that she was at her grandmother's house when her mother, Chasity, came and told her grandmother that someone had been "messing" with D.S. D.S. knew her mother was talking about Fox. D.S. said she had told her friend D.C. about Fox molesting her, and D.C. told her mother, Marsha, who told Chasity. D.S. testified that Fox had "messed" with her more than ten times. The first time occurred at her grandmother's house, where D.S. was spending the night.[7] She said Fox came in late, and she was on the couch. He reached for her belt buckle, and she kicked him. He then put his hands around her neck and choked her. He then let go, unbuckled her pants, and put his

---

[6] At the time of the trial, D.S. was living with her mother, and she had a ten-month-old son of her own.

[7] D.S. said that she had first stayed at her father Derrick's house, but when he got married, his wife's brother "started to look weird" at D.S., and D.S. said she did not feel comfortable staying there. So she started staying with her grandmother instead.

fingers in her vagina. This happened at a time when Fox was staying at D.S.'s grandmother's house while his trailer was being finished. Fox did not object to this testimony. On cross-examination, Fox's attorney had D.S. identify a statement she had written about the incident that she gave to Investigator Gatlin. Fox's attorney then had the statement entered into the record.

¶28. D.S. testified to another time when Fox took her to his trailer to get charcoal for a cookout the family had planned. He took a minute to come out, so she went inside. There was grit and sand on the floor. Fox shut the door behind her and "slid" her to an air mattress in his room. He got on top of her, pulled up her shirt, and started sucking her nipples. After that, he pulled down her pants and put his fingers in her. They then returned to D.S.'s grandmother's house for the barbecue, and Fox asked her if she wanted to go to his motel room. That evening, he took her to the motel, though he told her grandmother that he was taking her home.

¶29. At the hotel, Fox paid for the room, and she asked the desk clerk for the Wi-Fi password. She then played on her phone for the rest of the night until Fox went to sleep. She then went to sleep as well, but she was awoke the next morning by Fox's touching her vagina with his fingers. She said he also rubbed his penis on her vagina. He apologized and said he was sorry and that he was a pervert. D.S. said that Fox would apologize every time he did this.

¶30. D.S. confirmed that while they were riding the school bus, she told her friend D.C. about the touching. She said she told D.C. because Fox had made a comment about D.C.'s nickname "Juicy," and D.S. wanted to warn D.C. that "it's older men looking at us and it's

13

older men wanting to do stuff to us." She did not tell her mother because her grandmother on her mother's side was dying and because Fox told her not to say anything. He said it would break up the family and "you know what happened to Ole Boy and them." He was referring to a man who killed his family when it came out that he was messing with one of the girls.

¶31. On cross-examination, D.S. said that before it came out that Fox was messing with her, Chasity was thinking of having D.S. live with her grandmother. D.S. said she had been mouthing off to her mother and had hit her. D.S. said she did not have any problems with her mother; she was just holding stuff back from her, and it was making her angry. But she also felt that her mother should have known that something was going on with her.[8] D.S. said she wanted to stay at her grandmother's house because she (D.S.) had stopped Fox from messing with her and he had his own place. D.S. also said that Fox would come by her mother's house and show her the guns he had, "playing it like everything was cool so wouldn't nothing happen." She worried if she told her mother, Fox would come kill them.

¶32. D.S. said that when her mother took her to the police station, first her mother spoke to the officer, then he spoke with her, and then they all three spoke together. D.S. recalled going to McComb and meeting with a lady there and telling her what happened. She also talked to "Ms. Anne" and "Ms. Wilma." D.S. said she stopped going to therapy because she did not want to be sent off somewhere. But then she said she did not feel safe and that she

---

[8] D.S. said that Chasity's mother, D.S.'s grandmother, could tell something was going on because she asked D.S. about it. D.S. said she lied to her because that grandmother was dying.

14

ran away once and on two other occasions, staying out all night. After entering the statement that D.S. wrote about the first incident, she was asked about writing any other statements. She responded:

> I know that I wrote down some statements. Like if I don't - - if I didn't put the date on them, I don't know when I wrote them. All I know is that after the fact that it came out, that's when I stated writing them because I was told to. So if the date is not on there, I can't tell you when they was wrote. All I know is they was after. But everything that I wrote on them papers happened.

She said she wrote statements at various times and put them in her book bag or her room. She stated:

> It was so much so I would just keep writing them because I knew that I was supposed to write them. It was a lot that had happened I just wrote what I wanted to write on the statement, but it's more than that because I was going down there every weekend and every weekend something happened. So it was more than just the three statements I had wrote out.

Fox's attorney showed her a statement about the incident at Fox's trailer and had it entered into evidence. D.S. said that it was not her handwriting and that she asked D.C. to write it for her. D.S. said that she had other statements that she had not even turned in. Every time court would be continued, she would have written something to get ready for court.

*Motion for Directed Verdict*

¶33.    After D.S. testified, the State rested, and Fox moved for a directed verdict. He argued that the State had failed to meet its burden of proof because no one testified to any date certain of the incidents. The State responded that D.S. testified to going to the hotel, and that date was established by the hotel receipt. D.S. also testified that just before the hotel incident, the other incident occurred at the trailer Fox was renovating. They then went back to her grandmother's house, and then to the hotel that night. Thus, the dates were

15

established. The court denied the motion for a directed verdict.

<em>Witnesses for the Defense</em>

<em>Kayla Black</em>

¶34. Fox began his defense by calling Kayla Black, another one of Fox's nieces and a cousin of D.S. At the time of the trial, she was twenty-three, worked as a CNA, and had known D.S. for six or seven years at the time of the trial. She said that Fox would reward all the children in the family if they did well in school or at home. She described D.S. as quiet but said that D.S. did not like others to be around Fox and that "she would get mad." She said D.S. was happy around Fox and wanted to go everywhere he went. She never saw anything between the two of them that caused her concern.

<em>Rosalyn Reese</em>

¶35. Rosalyn was Fox's sister. She lived with her mother (D.S.'s grandmother) in a three-bedroom home. Rosalyn testified that from either her room or the grandmother's room, one could hear anything like a struggle in the living room. Rosalyn stated that Fox would withhold things from his nieces and nephews for bad behavior, like getting into trouble in school. For example, because D.S. got into trouble at school, Fox stopped paying D.S.'s phone bill and stopped buying her clothes.

<em>Darrell Reese</em>

¶36. Darrell was Rosalyn's husband. He testified that he worked in construction and that he and his crew were remodeling Fox's trailer in October 2016. During construction, Fox lived in a hotel. From October 2016 to May 2017, work on the double-wide trailer had just gotten underway. He testified that Fox did not keep an air mattress in the trailer, and he did

16

not see one during that time. On cross-examination, Darrell confirmed that there was grit and dust on the floor while they were working. He also agreed that an air mattress can be blown up and taken down in a matter of hours. But he said that there was no place in the trailer where an air mattress could have been hidden that he would not have seen it.

*Rosy Vance*

¶37. Rosy Vance was Fox's mother and D.S.'s grandmother. She testified that her hearing was good and that from her bedroom, she could hear the television in the living room. If there were a struggle or commotion in the living room, she would have heard it. Vance testified that Fox was living in a hotel while his trailer was being renovated and that his girlfriend, Felicia, stayed there with him.

¶38. Vance said that the family gets together every Saturday, and Fox paid for the food and did the cooking. D.S. was part of that when she joined the family. Vance said that on one occasion D.S. "blessed her out" because Vance had taken D.S. home when D.S. wanted to stay because Fox was at her home. D.S. came to her home only twice thereafter. One time, Vance told her she was not welcome; the other time, Vance told D.S. that D.S.'s lawyer did not want her to be talking to them. Vance also said that the day Chasity and D.S. accused Fox was the same day Fox announced his engagement.

*Felicia Simon*

¶39. At the time of the trial, Simon was Fox's fiancé. He proposed to her on May 19, 2017. Simon said that she often visited the trailer under construction and that there was no air mattress. Simon testified that on the night of October 14, 2016, she was not at the hotel where they had been staying. She was getting her hair done by her sister who lived in

17

Fayette. Simon said that because Vance went to the casino that night, Fox ended up having to take care of D.S.

*Fox*

¶40. Fox testified that he was a truck driver and the "go-to person" for his nieces and nephews. He would gift them for their grades and good behavior. Fox said he grew up poor but worked hard and now had two houses and dream cars people would want. He has no children of his own but has helped raise Simon's two boys. Fox testified that when he was not driving, he lived at American's Best Inn hotel "for two years easy." Fox said he did not spend the night at his mother's house. He said he and his father had a disagreement years back, and after that, he moved out and stayed other places. He said he had a stack of receipts from America's Best Inn because he stayed there so much.

¶41. Fox did not deny that he took D.S. to the hotel, but he explained the events that led up to him doing so. He said D.S. was staying with his mother (Vance), who had left to go to the casino. Fox took D.S. to his cousin's house to visit with his cousin's daughter. Around 8 p.m., he called his mother about bringing D.S. back to Vance's house, but Vance said she was running late. Fox then said he would bring D.S. back to her own home, but D.S. started crying. His mother could hear D.S. on the phone "balling," and she suggested that Fox just take her with him to the hotel. He said this was nothing unusual because he had taken his other nieces and nephews to the hotel in the past, where they would swim and watch the big-screen television. Fox also testified that Chasity actually called him after he and D.S. had arrived at the hotel. Chasity wanted to come see him. When he told her that D.S. was there with him, Chasity only said that he and she would have to do it another time.

Fox said he gave D.S. a comforter from the bed so she could sleep on the couch in the room. He denied any sexual misconduct with D.S. while they were at the hotel.

¶42.    He denied the incidents D.S. had written about, which his lawyer had him read aloud to the jury.  Fox said he first learned of the allegations against him on May 19, 2017, and suggested that Chasity and D.S. had other motivations for making them.  He recalled the May 19, 2017 date because the night before, he had gone to Chasity's house to tell her that he was getting engaged to Felicia the next day. Chasity started ranting and raving and "was pretty mad."  Fox also said that on May 14, 2017, D.S. had called him wanting money to buy an outfit for her birthday.  Fox refused because D.S. was in in-school suspension and was not minding her mother, so he told her to call her dad.  Fox had also refused to give D.S. money on May 19, 2017 as well, and later refused her request to go on a trip to Disneyland.

¶43.    The defense rested, and the State presented no rebuttal.

### Closing Argument and Verdict

¶44.    After being instructed, the jury heard the arguments of counsel.  Thereafter, the jury deliberated and returned a guilty verdict on all three counts.

### Post-Trial Proceedings

¶45.    On May 21, 2021, Fox filed a motion for a new trial.  He challenged Craig's expert testimony and the alleged inconsistent testimony of the child.

¶46.    Despite the numerous letters of support that were filed from friends, colleagues, and family members, vouching for Fox's character, the circuit court sentenced him on May  24, 2021, to serve fifteen years in the custody of the Mississippi Department of Corrections on the molestation charge and twenty-five years with five years suspended on each of the sexual

battery charges, with all sentences to run concurrently, plus five years of probation.

¶47. A new attorney entered an appearance for Fox on June 2, 2021, and on June 21, 2021, Fox's attorney who tried the case filed a motion to withdraw. On August 22, 2021, Fox's new attorney filed an amended motion for a new trial in which he raised Fox's ineffective-assistance-of-counsel claim, saying that his trial counsel "was nearing retirement and was not capable of handling the gravity of the charges at issue herein" and that counsel "due to his advanced age, lost and/or misplaced critical exculpatory evidence."

¶48. On December 28, 2021, yet another attorney entered an appearance for Fox. The court signed an order on March 29, 2022, allowing Fox's trial attorney to withdraw. On October 27, 2022, Fox filed a motion for a ruling on previous motions he had filed, and on January 30, 2023, he filed a pro se supplemental motion for a new trial. In this motion, he challenged the admission of certain evidence, including the certificate of authenticity that was attached to the America's Best Inn hotel receipt, photographs of the hotel room, and a map of various locations that the investigator prepared. Fox argued that the verdict should be set aside because the testimony of the investigator and D.S. was inconsistent with each other and with the video of the child's CAC interview.[9] Fox further detailed numerous instances where he believed his trial counsel failed to represent him properly. Fox also listed what he thought were inappropriate comments made by the State during closing arguments.

¶49. The court heard Fox's post-trial motions on March 21, 2023, and on April 21, 2023, the court entered an order denying them.

---

[9] The CAC interview video was not placed into evidence and does not appear in the record.

¶50. Fox appeals and raises seven issues: (1) whether Fox's indictment erroneously charged molestation, a lesser-included offense of sexual battery, which violated his right to be free of double jeopardy, (2) whether the circuit court erroneously allowed the State's expert to offer a medical opinion outside her area of expertise, (3) whether the circuit court erroneously admitted a hotel receipt into evidence, (4) whether the circuit court erred in denying Fox's motion for a directed verdict, (5) whether the State's comments in closing argument violated Fox's constitutional rights, (6) whether the circuit court erred in denying Fox's motion for judgment notwithstanding the verdict, and (7) whether errors by Fox's trial counsel give rise to a claim of ineffective assistance of counsel.

¶51. Fox filed a supplemental brief pro se and raises an additional issue: whether Juror 28 lied about not knowing him, denying his right to an impartial jury.

## DISCUSSION

I. **Whether the indictment erroneously charged molestation, a lesser included offense of sexual battery, and violated Fox's right to be free of double jeopardy.**

¶52. Fox argues that his indictment erroneously charged both an offense and a lesser-included offense, which violates double jeopardy. Fox was accused of committing two offenses on October 14, 2016: (Count I) sexual battery by penetrating an underage child by inserting his fingers in her vagina, and (Count II) lustful touching of a child's breasts (molestation). Fox claims that because molestation is a lesser-included offense of sexual battery, he could not be charged with both offenses, rendering the indictment defective.

¶53. The State argues that this issue is barred from review because Fox did not raise it to

21

the circuit court below. The State is correct. The record does not contain any written or oral motion challenging the indictment. "When a defendant fails to object to the form of the indictment, the issue is waived on appeal." *Shoemaker v. State*, 256 So. 3d 604, 612 (¶31) (Miss. Ct. App. 2018).

¶54.    Notwithstanding the procedural bar, "[w]e apply a de novo standard of review to claims of double jeopardy." *Woods v. State*, 30 So. 3d 362, 365 (¶8) (Miss. Ct. App. 2009) (citing *Boyd v. State*, 977 So. 2d 329, 334 (¶14) (Miss. 2008)). In addressing the double jeopardy claim we use the "same elements test" set out by the United States Supreme Court. *Ivey v. State*, 134 So. 3d 796, 798 (¶5) (Miss. Ct. App. 2013). "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). In *Ivey*, the defendant claimed his constitutional right against double jeopardy was violated because one of the fondling counts and the sexual battery count stemmed from the same incident. *Ivey*, 134 So. 3d at 798 (¶5). We stated that under the "same elements test," we look to see whether each statutory provision requires proof of a fact which the other does not. *Id*. We examined the elements of the two statutes (fondling and sexual battery) and determined that "[a]ttempted sexual battery does not contain the element of gratification of lust. Furthermore, fondling does not require the element of penetration." *Id*. at (¶7). Thus, because the two statutes require different proof, Ivey had no double jeopardy claim just because one of the fondling counts and the sexual battery count stemmed from the same incident. *Id*. at (¶5).

22

¶55.   Fox cites *Friley v. State*, 879 So. 2d 1031, 1035 (¶17) (Miss. 2004), where the Mississippi Supreme Court held that molestation under particular circumstances may be a lesser-included offense to sexual battery.  However, that case is factually distinguishable from the case at hand.  In that case, Friley had put his hand under a nine-year-old girl's swimsuit and inserted his finger inside her vagina while he fondled himself with his other hand.  *Id.* at 1032 (¶2).  He was charged with sexual battery without consent by willfully engaging in sexual penetration in violation of Mississippi Code Annotated section 97-3-95.  *Id.* at 1032-33 (¶4).  The jury was instructed on both sexual battery and molestation.  *Id.* at 1033 (¶6).  The jury found Friley guilty of molestation.  *Id.* at 1033 (¶4).  On appeal, this Court reversed, reasoning that the jury had acquitted Friley of the only charge in the indictment (sexual battery) and that the circuit court erred in finding that molestation was a lesser-included offense.  *Id.* at 1032 (¶5).  The Mississippi Supreme Court disagreed, examined the wording of the sexual battery and the molestation statutes, and found that "a plain reading of the statutes shows that sexual battery (penetration) includes molestation (touching).  It is impossible to penetrate without touching."  *Id.* at 1035 (¶15).  However, it should be noted that the crime in *Friley* involved a single act—penetration.  In Fox's case, the proof showed that his assault on D.S. at his trailer included the act of his sucking on her breasts and the separate act of putting his fingers in her vagina.  Thus, *Friley* is distinguishable.[10]

---

[10]   Fox also cites *Stewart v. State*, 228 So. 3d 872 (Miss. Ct. App. 2017); however, like *Friley*, that case involved the single act of a man inserting his tongue into a child's vagina on only one occasion.  *Id*. at 876 (¶13).

23

¶56.     More applicable is *Woods*, 30 So. 3d at 368 (¶16), where we held that a conviction of sexual battery and unlawful touching of a child did not violate the principles of double jeopardy because the defendant was charged with, and found guilty of, engaging in two separate unlawful acts during the same incident.  In that case, Woods lay down beside a seven-year-old child and attempted to have sexual intercourse with her.  *Id.* at 364 (¶4).  When the girl said that it hurt, he stopped.  *Id*.  Thereafter, the child went to her mother's bedroom, and Woods followed and began to touch her buttocks.  *Id*. at (¶5).  After being convicted on several counts of sexual battery and molestation, Woods raised *Friley*, arguing that his conviction of molestation for touching the child's buttocks was a lesser included offense of the sexual battery he was charged with under a different count.  *Id*. at 365-66 (¶9).  This Court pointed out, however, that *Friley* involved a single act by the defendant of cornering the child and inserting his finger into her vagina. *Id*. at 366 (¶10).  "Unlike *Friley*, the record indicate[d] that Woods's crimes against [the child] were not confined to one event or act."  *Id.*  We pointed out that Woods lay by the child in the living room, "put his hand in her butt," and tried to sexually assault her.  *Id*. at (¶11).  Thereafter, Woods followed the child into the mother's bedroom and began to "feel her butt" again, a second incident of touching.  *Id*.  We stated that "it is well-settled that separate acts, against the same victim, committed close in time to one another, may constitute separate criminal offenses."  *Id*. at 367 (¶13).  We held that in this case, "these were two separate acts or encounters between Woods and T.S.  Consequently, these acts constituted two separate crimes." *Id*. at (¶15).  In this case, Fox began his abuse of D.S. by sucking on her breasts.  He then moved on to penetrate her vagina with his fingers.  Those are two separate acts committed close in time

24

to one another.

¶57.   Even more on point is *Winters v. State*, 814 So. 2d 184, 186 (¶2) (Miss. Ct. App. 2002), where we held that when a man lured a fourteen-year-old boy into an abandoned house and performed oral sex and anal sex on the boy, the man was properly convicted of two counts of sexual battery.  Winters claimed that charging him with two separate acts of sexual battery that occurred in the same sexual encounter violated double jeopardy.  *Id*. at 189 (¶20).  In considering his argument on appeal, this Court stated, "While these acts occurred at the same encounter, they were separate violations of J.W.'s body requiring proof of separate facts." *Id*. at (¶22).  We held that the acts "constituted two separate incidents because they required proof of facts of two separate acts of penetration, oral and anal, and lack of consent to each different act." *Id.* at 190 (¶23).

¶58.   In the case at hand, Fox was appropriately charged with two separate crimes for the incident that occurred on the night of October 14, 2016, at his trailer.  The indictment charged (and the proof later showed) that Fox first touched D.S.'s breasts (the crime of molestation) and then inserted his fingers into her vagina (sexual battery).  Given the different body parts affected and the different nature of Fox's actions, the molestation in this case was not a lesser-included offense of sexual battery but a separate crime. Accordingly, notwithstanding the procedural bar, we find no merit to Fox's double jeopardy issue.

II.     **Whether Juror 28 lied about knowing Fox and deprived him of the right to an impartial jury.**

¶59.   In his pro se brief, Fox argues that he was denied a fair and impartial jury because he claims that Juror 28 "lied" and said she did not know him, when, in fact, they had had an

encounter years before. The State responds that Fox is procedurally barred from raising this issue because he did not challenge the juror during the trial, nor did he raise the issue in any of his post-trial motions.

¶60. "A party who fails to object to the jury's composition before it is empaneled waives any right to complain thereafter." *Johnson v. State*, 224 So. 3d 549, 552 (¶8) (Miss. Ct. App. 2017). "A defendant who wishes to claim error has an obligation to call to the court's attention matters of which he is aware, and should he fail to do so, he waives any objection." *Id.* (quoting *Doss v. State*, 906 So. 2d 836, 840 (¶16) (Miss. Ct. App. 2004)). "[I]ssues raised for the first time on appeal are procedurally barred from review as they have not first been addressed by the trial court." *Hughes v. State*, 360 So. 3d 657, 660 (¶7) (Miss. Ct. App. 2023).

¶61. In this case, Fox did not challenge Juror 28 as a juror at trial, nor did he raise the issue to the circuit court in his post-trial motions for a new trial. Fox voiced no objection to Juror 28 as a juror neither during the selection process nor at any time during the trial. By not objecting, a defendant waives his right to complain on appeal. *Carr v. State*, 190 So. 3d 1, 7 (¶26) (Miss. Ct. App. 2015). In addition, Fox did not raise any concerns about Juror 28 in his post-trial motions for a new trial. Accordingly, because he never raised this issue to the circuit court, it is procedurally barred from consideration on appeal.

¶62. However, despite the procedural bars, we may determine whether the record shows an error affecting a defendant's substantive rights (i.e., "plain error") to ensure there has been no miscarriage of justice. *Chandler v. State*, 345 So. 3d 632, 638-39 (¶15) (Miss. Ct. App. 2022). "To succeed under the plain-error standard, [a defendant] must show (1) an error at

26

the trial level (2) that resulted in a manifest miscarriage of justice." *Carr*, 190 So. 3d at 7 (¶27). Our review of the record reveals no errors by the circuit court during the jury selection process. The court appropriately questioned jurors.[11] Juror 28 only responded directly to one question, whether anyone knew Investigator Gatlin. Juror 28 said when she was a principal at Lloyd Star School, Gatlin helped with their drug prevention program. Apparently, her mentioning Lloyd Star School did not trigger Fox to recall that he had met with her at the school in 2008 or 2009 when she had made negative comments about his nephew. Nor did he mention that she had barred him from his nephew's basketball game as well. But Fox never voiced any concern over her participation until now on appeal. In addition, he provides no evidence that Juror 28 recognized him and lied about not knowing him or that she harbored an animus against him that tainted the jury. There must be evidence to show that Fox was not in fact tried by a fair and impartial jury. *Carr*, 190 So. 3d at 7 (¶29). Therefore, notwithstanding the procedural bar, we find no plain error in Juror 28's selection as a juror.

**III.   Whether the circuit court erred in allowing the State's expert Ann Houston Craig to offer medical opinion testimony in violation of *Daubert* and its progeny.**

---

[11] During jury selection, the court had the attorneys and Fox introduce themselves and asked if anyone was related to any of them by blood or marriage. Three jurors (none of them Juror 28) responded and the court questioned those who did. The court then asked if any juror was a "close personal friend" of any of the parties. Several jurors responded (Jurors 11, 20, 31, 40, 49), and the court interrogated them further. The court then read the indictment to the venire and asked if anyone had heard of the case, and then whether anyone felt they could not be fair or impartial given the nature of the case. Several jurors, but not Juror 28, responded, and the court questioned them further. The court asked if any of the jurors knew any of the potential witnesses, including Fox's sister, Rosalyn Reese. Only one juror responded that he knew Reese's husband, but he did not know Rosalyn. Juror 28 did not respond to this question; however, she responded when the court asked if anyone knew Investigator Gatlin as noted above.

27

¶63. Ann Houston Craig testified as an expert mental health therapist and determined that D. S. suffered from post-traumatic stress disorder due to the child's reported abuse by Fox. At trial, Fox challenged her qualifications to give such an opinion and objected that Craig's testimony about what the child reported to her was hearsay.[12] He raises these same issues on appeal.

¶64. The admission of expert testimony is reviewed under the abuse-of-discretion standard. *Smith v. State*, 326 So. 3d 510, 517 (¶18) (Miss. Ct. App. 2021) (citing *Clark v. State*, 315 So. 3d 987, 993-94 (¶6) (Miss. 2021)).

> A two-pronged inquiry is required when evaluating the admissibility of expert testimony: (1) is the witness qualified, and (2) is the testimony relevant and reliable?

*Smith*, 326 So. 3d at 520 (¶30).

¶65. The *Smith* case is particularly relevant to the case at hand. In *Smith,* fourteen-year-old K.S. told a therapist in 2011 that her adoptive father had sexually abused her. *Id*. at 514 (¶4). In 2012, Smith was indicted on one count of sexual battery and tried in 2016. *Id*. at (¶¶5, 7). The State called as a witness Emily Pfaff, one of K.S.'s former therapists from Youth Villages, where the child had lived after the reported abuse. *Id*. at (¶7). Pfaff testified to the abusive activities that K.S. reported to her. *Id*. at 516 (¶12). Pfaff also testified that K.S. was diagnosed with bipolar disorder and oppositional defiant disorder. *Id*. In her opinion, Pfaff

---

[12] In his brief Fox asserts that "the bulk of the clinical social work and report in this case was performed by Jade Williamson, L.M.S.W, who was unavailable to testify because her license had been suspended in 2022." However, this information was not presented to the circuit court prior to Craig's testimony, and Craig was not questioned about Williamson's involvement with D.S.'s case. Although defense counsel referred to a "report" Craig completed, the report was not placed into evidence and does not appear in the record.

testified that K.S.'s characteristics were consistent with children who had been sexually abused. *Id.* Smith was convicted, and on appeal he claimed that the circuit court had erred in allowing Pfaff to give an expert opinion. *Id*. at (¶¶15-16). This Court affirmed the circuit court's admission of Pfaff's testimony because she was qualified as an expert, and her testimony was reliable and relevant. *Id*. at 521 (¶34). Concerning Pfaff's qualifications, we noted that she had the education (a bachelor's degree in psychology and master's degree in mental health counseling), training (in three specific behavioral treatments for adolescents who had experienced trauma), and experience in mental health counseling (in her three years of clinical experience, she had treated between fifty and seventy-five youths, many who were sexually abused). *Id*. at 520 (¶30). Although she had only testified once before in person, she had been an expert for the court over the phone. *Id*. Moreover, Pfaff was only going to testify to what the child reported, her observations of the child, and whether she demonstrated the characteristics of a child who had been sexually abused. *Id.* We found no error in the trial court's finding that Pfaff was qualified. *Id*.

¶66. We also held that Pfaff's testimony was relevant and reliable. *Id*. at (¶31).

> Evidence is relevant when (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the case.

*Id*.; *accord* MRE 401. We noted that Pfaff had treated the child for approximately six months and Pfaff made her observations and diagnoses based on those sessions. *Id.* In addition, the child had disclosed that she had been sexually abused, which made Pfaff's testimony relevant. *Id*.

¶67. In the case at hand, Craig's qualifications and testimony were strikingly similar to

29

Pfaff's testimony in *Smith*. Craig earned a bachelor's degree in psychology in 2011 and a master's degree in clinical social work in 2015. In June 2017 when she evaluated and treated D.S., Craig was a licensed master social worker, qualified to make psychological diagnoses. With that certification, she could do the same things a licensed *clinical* social worker could do except run a private practice and bill insurance companies. She had been fully trained in the trauma-focused cognitive behavior therapy used to diagnose D.S. with post-traumatic stress disorder (PTSD). Per her resume, which was entered into evidence, Craig had worked as a therapist and behavioral specialist at Region 8 Mental Health from July 2015 to August 2016 and joined the CAC in August 2016. At the time of the trial, she was both a licensed master social worker and a licensed clinical social worker. Like the expert in *Smith*, Craig testified about the child's disclosures of the abuse and about the diagnosis of the child that Craig had reached based on her training and her observations of the child during the therapy sessions D.S. attended. As we stated in *Smith*, "the scope of permissible expert testimony under Mississippi Rule of Evidence 702 includes an expert's opinion that the alleged victim's characteristics are consistent with those of children who have been sexually abused." *Id*. at 521 (¶33) (citing *Lawson v. State*, 292 So. 3d 266, 276 (¶32) (Miss. Ct. App. 2019)). Moreover, under Mississippi Rule of Evidence 803(4), a statement made for purposes of medical treatment or diagnosis is not hearsay.[13] *See also Dandass v. State*, 233 So. 3d 856,

---

[13] Mississippi Rule of Evidence 803(4) provides:

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

. . . .

(4) Statement Made for Medical Diagnosis or Treatment. A statement that:

864-65, 867 (¶¶21-22,34) (Miss. Ct. App. 2017) (videotape of forensic interview of child in sex abuse case admissible under Rule 803(4)). Just as in *Smith*, we find Craig was qualified to testify as an expert, that her testimony was relevant and reliable, and that her expert testimony, including statements made to her by D.S., was not admitted in error.

### IV. Whether the circuit erred in admitting the certificate of authenticity and hotel receipt.

¶68. During Gatlin's testimony, the circuit court admitted into evidence a receipt from America's Best Inn dated October 14, 2016, showing that Fox rented a room that night. The receipt also includes the number of the room (124). Attached to the receipt was a sworn statement from the hotel's owner entitled a "Certificate of Authenticity," noting that records such as this are regularly made in the course of business and that this record was made in the course of America's Best Inn's business. Fox argues that the circuit court erred in admitting this document because it made no findings as to the document's authenticity or admissibility.

¶69. Initially, we point out that Fox did not object to the admission of the evidence, and therefore, again, he did not preserve this issue for appeal. He faults the circuit court for not inquiring if the defense had any objection. However, it is not the function of the court, but of the party, to object. "In order to preserve an issue for appeal, counsel must object. The failure to object acts as a waiver." *Havard v. State*, 928 So. 2d 771, 791 (¶34) (Miss. 2006)

---

(A) is made to any person at any time for--and is reasonably pertinent to--medical diagnosis or treatment;
(B) describes medical history; past or present symptoms or sensations; their inception; or their general cause; and
(C) is supported by circumstances that substantially indicate its trustworthiness.

(citing *Carr v. State*, 873 So. 2d 991, 1004 (Miss. 2004)). Accordingly, because Fox did not object to the admission of the hotel bill and certificate of authenticity, he has waived the issue.

¶70. Notwithstanding the waiver, Fox's argument that the circuit court abused its discretion in admitting the document has no merit. Mississippi Rule of Evidence 803(6) provides that regularly kept business records are an exception to the hearsay rule.[14] According to the rule, if properly authenticated by the custodian, such records are admissible. In this case, Patel, the owner and custodian of the hotel records, authenticated the records in his certificate, establishing the nature of the records and their maintenance in the regular course of business. Fox argues that Gatlin was not the appropriate witness to present the document. However, Gatlin secured the records and certificate, and later the State presented Paris Primeaux, the

---

[14] Mississippi Rule of Evidence 803(6) provides:

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
. . . .
(6) Records of a Regularly Conducted Activity. A record of an act, event, condition, opinion, or diagnosis if:
    (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;
    (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
    (C) making the record was a regular practice of that activity;
    (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11); and
    (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

32

clerk who had generated the bill, to testify as to its accuracy. We find no error in the bill's admission into evidence.

¶71. Fox further argues that there were other hotel receipts that could and should have been entered and to enter only one was prejudicial to him, stating "had all the receipts been entered, it would have substantially undermined any malignant motive in having D.S. at a hotel room in October 2016." That may be so, but nothing prevented Fox from securing and entering those additional hotel receipts. Fox testified on his own behalf and told the jury that he stayed at America's Best Inn regularly. Therefore, he could have entered those other receipts himself. We find no prejudice to Fox nor any abuse of the court's discretion in the admission of the October 14, 2016 hotel receipt and certificate of authenticity.

**V.   Whether the circuit court erred in denying Fox's motion for a directed verdict at the conclusion of the State's case.**

¶72. Fox also raises the circuit court's denial of his motion for a directed verdict based on insufficient evidence at the close of the State's case as a separate issue of appeal. However, Fox last challenged the sufficiency of the evidence in his post-trial motion for judgment notwithstanding the verdict; therefore, "we will consider all of the evidence, not just that supporting the case for the prosecution." *Fox v. State*, 378 So. 3d 1007, 1016 (¶24) (Miss. Ct. App. 2024) (quoting *Hodges v. State*, 743 So. 2d 319, 325 (¶38) (Miss. 1999)). In other words, "[w]hen the sufficiency of the evidence is challenged on appeal, this Court reviews the circuit court's ruling on the last occasion when the sufficiency of the evidence was challenged before the trial court." *Id.* (quoting *Hodges*, 743 So. 2d at 325 (¶36)). Accordingly, we need not separately address the circuit court's ruling on Fox's motion for

a directed verdict and, instead, analyze the issue in Part VII of this opinion concerning the denial of his motion for judgment notwithstanding the verdict.

### VI. Whether the State's closing arguments violated Fox's constitutional rights.

¶73. Fox contends that the State made comments during its closing argument that violated his Constitutional rights, constituting reversible error. These improper comments related to Gatlin's testimony concerning the map with the locations of the various residences of the parties and comments that the State had additional evidence that it did not offer in order to bolster D.S.'s credibility. However, Fox did not object to these comments during the argument or raise an objection to them at any time, so he has waived the issue on appeal. *Williams v. State*, 512 So. 2d 666, 672 (Miss.1987) (failure to object to prosecutor's closing argument is fatal); *Walker v. State*, 671 So. 2d 581, 616 (Miss. 1995) (because of defendant's lack of objection to comments in closing argument, the issue was procedurally barred and need not be considered). Because Fox failed to object to the prosecutor's closing remarks, he is procedurally barred from raising the issue of their propriety on appeal. Notwithstanding the bar, we find this issue has no merit.

¶74. "[I]f a contemporaneous objection is not made, an appellant must rely on the plain-error rule to raise the unpreserved argument on appeal." *Williams v. State*, 20 So. 3d 722, 726 (¶12) (Miss. Ct. App. 2009). "The standard of review that appellate courts must apply to lawyer misconduct during opening statements or closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Hampton v.*

*State*, 815 So. 2d 429, 433 (¶16) (Miss. Ct. App. 2002). In *Ambrose v. State*, 254 So. 3d 77, 129 (¶163) (Miss. 2018), the defendant did not object to the prosecutor's improper comment. The Mississippi Supreme Court stated:

> We repeatedly have provided that, though the failure to object contemporaneously generally waives a claim of prosecutorial misconduct during closing argument, we will review such a claim if the prosecutor's statement was so inflammatory that the trial judge should have objected on his own motion.

*Id*. at 129-130 (¶165). To determine if a prosecutor's closing remarks constitute reversible error, the Court employs a two-part test: first we ask whether the remarks are improper, and second, we ask whether the remarks prejudiced the defendant's rights. *Moss v. State*, 977 So. 2d 1201, 1211 (¶20) (Miss. Ct. App. 2007).

### A. Comments about Gatlin's Map

¶75. During his testimony, Investigator Gatlin created a map and identified four locations: Fox's trailer, Fox's mother's (D.S.'s grandmother's) home, Chasity's home (where D.S. was living in October 2016), and America's Best Inn. He testified that all places were located in Lincoln County. In closing, the State pointed out how Gatlin's testimony and the map established an element that the State needed to prove, namely that crimes were committed in Lincoln County. Fox says that he takes issue with these remarks "on the grounds that it seemingly suggest[s] that the State does not and cannot establish beyond a reasonable doubt where any of the allege offenses took place." We fail to see the prejudicial nature of the State's comment. The State was clearly pointing to evidence in the record that established a necessary element of the proof.

### B. Comments about the October 14, 2016 Acts

35

¶76. Fox next argues that the State's description of the touching and penetration acts at Fox's trailer was prejudicial because "a charge of gratification of lust is a lesser-included offense of sexual battery." This may be Fox's legal argument, but he fails to articulate how a description of the act as reflected in D.S.'s testimony prejudiced him. The record reflects that the State was merely recounting D. S.'s testimony of what happened for the jury.

### C. Comments about Other Evidence

¶77. Fox cites the following comment by the prosecutor:

> This is a girl who is telling you the truth. He did to her exactly what she said. And not only what said but more that she didn't write down that didn't get put into evidence.

Fox asserts that this statement was intended to bolster D.S.'s credibility and imply there was other evidence (perhaps of other crimes) that the State did not offer. However, in all fairness, the entire statement by the prosecutor reads:

> This is a girl who is telling you the truth. He did to her exactly what she said. And not only what said but more that she didn't write down that didn't get put into evidence. *She went home and wrote about all the things. She told you it was more times than this but this is the stuff that I wanted to write about.*

Again, the State was merely summarizing D.S.'s testimony that she had written many statements about the abuse, but the ones she referred to during the trial were the key ones. Moreover, Fox's attorney himself had brought out all these statements on cross-examination and had D.S. read them to the jury. The State did not go any further to infer from the child's statement that Fox should be found guilty of being a serial predator or to convict him on evidence not presented. The State merely explained the evidence and testimony that was presented.

36

¶78.   However, although not argued by Fox, the prosecutor's statement that the "girl is telling the truth" was improper. "A prosecutor is prohibited from stating his personal opinion as to the veracity of a witness," which generally means that the prosecutor may not "vouch for or bolster a witness by commenting in closing argument that the witness was telling the truth." *Johnson v. State*, No. 2022-KA-00665-COA, 2024 WL 3663272, at *5 (¶30) (Miss. Ct. App. Aug. 6, 2024) (quoting *Stokes v. State*, 141 So. 3d 421, 427 (¶23) (Miss. Ct. App. 2013)) *reh'g denied* (Nov. 26, 2024).  In defense of his client, Fox's attorney did the same thing, commenting about Fox's taking the child to the hotel and that Fox "was totally honest about what he said.  He didn't lie.  He could have made up a story.  He could have gone somewhere else."  We have reviewed the record of Fox's trial in its entirety to determine if this comment resulted in a miscarriage of justice.  Even taking away the State's improper comments and D.S.'s testimony about writing statements, there was still sufficient evidence to convict Fox of the acts for which he was charged.  *See McCoy v. State*, 954 So. 2d 479, 489 (¶¶30-31) (Miss. Ct. App. 2007) (holding no reversible error occurred due to clearly improper statements by prosecutor, which were followed by no objection, because taking away comments, it remained clear there was sufficient evidence to convict).  Accordingly, the prosecutor's comment about D.S. telling the truth was not so inflammatory that the judge should have objected on his own, nor did it prejudicially affect Fox's substantive rights or constitute plain error.

### D.    Alleged Threats

¶79.   In his pro se brief, Fox asserts that it was prejudicial for the State to refer in closing

37

to "alleged murders [by child abusers] that were never recorded in Brookhaven, MS." However, whether such murders actually occurred, D.S. testified she was worried about losing her family and her life. She said Fox would "bring up the incident about what happened to them people in Brookhaven where that man killed the whole family just because he said something." Any comment in closing argument by the State of veiled threats to D.S. was testified to by D.S. herself. There was no prejudice in the State's recapping this testimony.

**VII. Whether the circuit court erred in denying Fox's motion for judgment notwithstanding the verdict or, in the alternative, a new trial.**

¶80. Fox next contends that the circuit court erred in denying his motion for JNOV or, alternatively, a new trial. "A motion for [a JNOV] implicates the sufficiency of the evidence." *Sanders v. State*, 270 So. 3d 82, 84 (¶3) (Miss. Ct. App. 2018) (citing *Lenoir v. State*, 224 So.3d 85, 90 (¶18) (Miss. 2017)).

> We must accept as true all credible evidence consistent with guilt and give the State the benefit of all favorable inferences that may reasonably be drawn from the evidence. We may reverse only when, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty. Thus, if any rational trier of fact could have found each and every one of the elements of the crime beyond a reasonable doubt, when viewing the evidence in the light most favorable to the prosecution, the verdict must stand.

*Id.* "We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the elements; rather, we must decide whether a reasonable juror could rationally say that the State did." *Johnson v. State*, 310 So. 3d 328, 331 (¶13) (Miss. Ct. App. 2021) (viewing evidence in light most favorable to the State).

38

¶81. At trial, the only basis Fox argued to support his motion for a directed verdict at the close of the State's case was that the State had not proved the dates of the incidents. But D.S. testified that the first incident of touching and penetration occurred at the trailer that Fox was renovating. Thereafter, she said they went to D.S.'s grandmother's home and then spent the night at the hotel. The hotel receipt and testimony of the clerk showed that Fox and the child checked in on October 14, 2016, establishing that date as the date of the first incident. D.S. also testified that Fox woke her the next morning by touching her again, establishing a date of October 15, 2016, for the second incident.

¶82. On appeal, Fox raises other reasons why he believes the circuit court should not have denied his motion for a directed verdict or his JNOV motion. He alleges that D.S.'s and Chasity's testimonies were "wholly self-serving" and points out that there was no physical or forensic evidence to corroborate the abuse. However, the State presented Marsha Clark to corroborate Chasity's testimony about how she learned of the abuse, and the State called her daughter D.C. to corroborate D.S.'s testimony about the abuse. Fox argues that Craig's expert testimony should not have been allowed, but we have disposed of that issue above. Fox points out that Investigator Gatlin, for instance, never obtained a search warrant for D.S.'s grandmother's house or Fox's trailer (even though the complaint was made three months after the incident). Fox points out that Marsha Clark was a close friend of D.S.'s mother. Fox cites portions of Chasity's testimony to show that Chasity had struck (i.e., abused) D.S. as well and to show that Chasity herself had a sexual relationship with Fox. Despite these points, the witnesses did testify to the incidents or reports of the incidents in

39

question as well, and "[i]t is the role of the jury to evaluate the veracity of the witnesses." *Sanders*, 270 So. 3d at 86 (¶15).

¶83. Moreover, none of the alleged deficiencies Fox points to undermine the fact that the State did present testimony that established each element of the crimes charged. The crime of touching a child for lustful purposes, Mississippi Code Annotated section 97-5-23, requires proof that someone over the age of eighteen handles, touches, or rubs a child under the age of sixteen for the purpose of gratifying lust. *See also Ivey*, 134 So. 3d at 798 (¶6). Sexual battery requires proof of sexual penetration of a child at least fourteen years old but under the age of sixteen if the person is thirty-six or more months older than the child. Miss. Code Ann. § 97-3-95(1)(c). In this case, the State established the ages of both D.S. and Fox as of October 2016 (she was fifteen, and Fox was forty-two). Through D.S.'s testimony and other corroborating evidence, the State presented proof of the touching and penetration. Accordingly a rational juror could find Fox guilty of the two incidents of sexually abusing D.S.

¶84. Considering the evidence in the light most favorable to the State, we find sufficient evidence exists to support Fox's conviction and that the circuit court properly denied Fox's motion for a directed verdict and motion for JNOV or a new trial.

### VIII. Whether errors of Fox's trial counsel gave rise to a claim of ineffective assistance of counsel.

¶85. Fox raises numerous alleged errors by his trial counsel to support his claim of ineffective assistance of counsel by his trial attorneys.

¶86. "To prevail on an ineffective-assistance-of-counsel claim, the defendant must prove

40

that: (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced the defense of his case." *Lomas v. State*, 328 So. 3d 670, 691 (¶63) (Miss. Ct. App. 2021) (citing *Havard v. State*, 988 So. 2d 322, 328 (¶13) (Miss. 2008)). To show deficient performance, a defendant must show that counsel's performance "fell below an objective standard of reasonableness." *Id*. Counsel must have "made errors so serious that he or she was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Crawford v. State*, 218 So. 3d 1142, 1150 (¶18) (Miss. 2016). To prove prejudice to the defense, a defendant must show that "there was a reasonable probability that 'but for' counsel's errors, the trial court's result would have been different." *Moss*, 977 So. 2d at 1213-14 (¶30). To prove that the "deficient performance prejudiced the defense" requires a showing that "counsel's errors were so serious [that they] deprive[d] the defendant of a fair trial, a trial whose result is reliable." *Brown v. State*, 306 So. 3d 719, 749 (¶124) (Miss. 2020).

¶87. Under Mississippi Rule of Appellate Procedure 22(b), when a defendant is represented on appeal by counsel who did not try the case, he must raise this issue if the error is apparent on the record or be barred from raising it in any post-conviction motion. *Lomas*, 328 So. 3d at 691 (¶62) (citing *Branch v. State*, 882 So. 2d 36, 49 (¶18) (Miss. 2004)). If an appellant's claims of ineffective assistance of counsel are based on facts fully apparent from the record, we will proceed to review them. *Id*. However, "generally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Shepard v. State*, 256 So. 3d 12, 24 (¶63) (Miss. Ct. App. 2018) (quoting *Dartez v. State*, 177 So. 3d

41

420, 422-23 (¶18) (Miss. 2015)).

> It is unusual for [an appellate c]ourt to consider a claim of ineffective assistance of counsel when the claim is made on direct appeal. An appellate court will rule on the merits on the rare occasions where (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.

*Harris v. State*, 378 So. 3d 971, 980 (¶35) (Miss. Ct. App. 2024). If facts needed to support an ineffective-assistance-of-counsel claim are not apparent on the record, we may affirm the circuit court's judgment while preserving a defendant's right to pursue his claim through a petition for post-conviction collateral relief. *Shepard*. 256 So. 3d at 24 (¶¶63-64)

¶88. Fox raises several instances of his counsel's representation at trial that he argues fell below the standard of reasonableness, including but not limited to the failure to introduce or proffer the Children's Advocacy Center video of D.S.'s interview and the video of Gatlin's interview of Primeaux; the failure to obtain Chasity Smith's affidavit to support the August 17, arrest warrant; and the failure to make contemporaneous objections. The State, however, contends that Fox's claims are premature and specifically states that it does not stipulate that the record is adequate to allow this Court to make a finding. We agree with the State that the record is not sufficient for us to make a ruling on such a matter. However, Fox certainly has the right to raise arguments in post-conviction collateral proceedings under Mississippi Code Annotated sections 99-39-1 to -29 (Rev. 2020), presenting the necessary affidavits and proper proof. Therefore, we decline to address this issue, preserving for Fox the right to raise his claims of ineffective assistance of counsel in a post-conviction collateral proceeding.

## CONCLUSION

¶89. Because the October 14, 2016 molestation was not a lesser-included offense of the sexual battery, but a separate crime, the indictment was not flawed and did not constitute double jeopardy. Further, because Fox did not object to the seating of Juror 28 or raise his challenge to the juror in any post-trial motion, his claims are procedurally barred. Notwithstanding that bar, his claim that he did not have a fair and impartial jury has no merit. Further, we find no error by the circuit court in admitting the expert testimony or the documentary evidence concerning the hotel bill. Further, we find no error by the circuit court in denying Fox's motion for a directed verdict or motion for JNOV or for a new trial, finding that there was sufficient evidence to support Fox's convictions. Moreover, notwithstanding the procedural bar to Fox's claims of attorney misconduct during closing argument, we find that the State's remarks in closing did not violate Fox's constitutional rights. Finally, because the record is not sufficient to make a ruling on the issue of ineffective assistance of counsel, we decline to address that issue, preserving for Fox the right to raise that claim in a post-conviction collateral proceeding.

¶90. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, LAWRENCE, McCARTY, SMITH, EMFINGER AND WEDDLE, JJ., CONCUR.**